HEATBATH CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT..

Docket No. 17563.    Promulgated March 1, 1950.

*Bennett Sanderson, Esq.,* and *Robert J. Donelan, Esq.,* for the petitioner.

*Paul P. Lipton, Esq.,* for the respondent.

334

336

338

OPINION.

MURDOCK, *Judge*: It was incumbent upon the petitioner to show that the total salaries paid and claimed as deductions, or at least some amounts larger than those allowed, represent reasonable compensation for the services rendered by the officers. Careful consideration has been given to all of the evidence that appears in the record but it does not justify a finding that reasonable compensation for any of the officers was in excess of the amount allowed by the Commissioner. There is evidence of the services performed by the four persons, of the earnings and profits, and of the salaries paid in prior years. There is no evidence of what the officers might have earned elsewhere or of what it would have cost the petitioner to obtain their equals, and no adequate test by comparison is afforded. The petitioner argues that a part of the salaries in question were to make up for the fact that the four persons were underpaid in prior years by the predecessor corporation. That could raise an interesting question, but it does not appear that these persons were underpaid to any great extent by the predecessor and the amounts allowed by the Commissioner seem ample to make up for all services, past and current.

Wilbur and the two Walens were the directors of the petitioner and the owners of practically all of its stock. They authorized enormous, contingent salaries to themselves in such a way that Wilbur's salary for any year would exactly equal the total salaries paid to Walen and his wife. That circumstance is not without significance, particularly when the question of a reasonable salary of Isabel Walen is considered. The Commissioner allowed a deduction of $1,000 for each year as reasonable compensation for her, although she was paid much larger amounts. Her services to the predecessor and also to the petitioner were minor in importance, being clerical in nature and on a part time basis. Her title was an empty one. Walen and Wilbur handled the financial affairs of the petitioner. Isabel and the other officers appeared on the witness stand. The evidence indicates that she was amply paid by the predecessor and that her services to the petitioner were not worth more than $1,000 a year.

The salaries of Walen and Wilbur are involved only for the year 1941, since the Commissioner allowed the full amount paid to them for 1940 and 1942. They were the two principal officers and were largely responsible for the success of the petitioner, although there were, apparently, some subordinate executives who received relatively high salaries. The Commissioner disallowed a part of the amounts claimed as salary for each for 1941, but still he allowed substantial amounts. The Commissioner allowed salary deductions for these two men in increasing amounts as the business increased, which seems logical. The sales and earnings figures do not show that their services fairly entitled them to larger shares of the earnings than the amounts allowed by the Commissioner as deductions for 1941. The petitioner is claiming larger salary deductions for these two men for 1941 than were claimed and allowed in full for 1942, although sales and income for 1942 far exceeded those for 1941, and there is no reason to believe that the officers put forth greater efforts in 1941 than in 1942. They put in full time and did their best in each year. It does not appear that the predecessor underpaid these men to any great extent, and it must be remembered in that connection that they spent a part of their time working upon a valuable invention for which they are claiming royalties under another issue. It is easy enough to conclude that these two men were entitled to large salaries for 1941, but the Commissioner has allowed them large salaries and the evidence as a whole, including portions not discussed herein, does not justify a finding that the amounts allowed were less than reasonable compensation for their services for 1941.

Norton's salary presents a little different situation in that he owned only two shares of stock, excessive payments to him could not represent dividends; and the reason for paying him an excessive salary is not so apparent. However, the evidence shows that he was overpaid. He testified to his amazement when he first heard of the amount of his 1941 salary. He received no salary for 1940, $11,700 for 1941, and $15,600 for 1942, a total of $27,300 during the taxable years. The Commissioner allowed as a deduction $5,200 of the amount paid him for each of the years 1941 and 1942. He had full time employment elsewhere and devoted only such spare time as he had available to the affairs of the petitioner, its chief officers, their wives, and others. The Wilburs and the Walens paid him nothing for services rendered to them. It is not clear just how much time he devoted exclusively to the affairs of the petitioner, but the deductions allowed represent ample compensation for any services which this record shows he rendered, taking into account past services as well as those performed in 1941 and 1942.

Wilbur and Walen first applied for a United States patent on their process for imparting a black finish to the surface of ferrous metals

on January 20, 1939.   No claim for a product was made in that application.   They executed on the same date an instrument purporting to assign their entire interest in the invention to the predecessor corporation, but the assignment was never delivered and never became effective and no patent was granted on the application.   They made another application for a United States patent on April 3, 1939, in which they claimed both a process and a product.   They gave the predecessor corporation a license on April 14, 1939, in which they recited that application for a patent had been filed on April 3.   No patent was ever granted on the application of April 3, 1939.   The Commissioner argues that the predecessor, at the time of its dissolution, still had rights acquired under the assignment of January 20, 1939, and the license of April 14, 1939, and the petitioner acquired those rights.   The intent of the parties as shown by their entire course of action is controlling.   *DeForest Co.* v. *United States,* 273 U. S. 236; *Baldwin Rubber Co.* v. *Paine & Williams Co.,* 107 Fed. (2d) 350; certiorari denied, 309 U. S. 676.   Walen and Wilbur never intended the assignment to become effective and never delivered or recorded it, and, as a consequence, nothing was transferred by it.   Also, the parties did not intend the license dated April 14, 1939, to remain in effect in the event that letters patent were not granted on the application of April 3, and, since no letters patent were granted on that application, the petitioner, at least, never acquired any rights under that particular license.   The predecessor did not transfer to the petitioner any rights acquired under those documents.   Furthermore, those documents can be disregarded for the reason that the later assignment of March 7, 1940, gave rights as complete as any actually given theretofore.

Walen and Wilbur were employees of the predecessor, but there was no understanding between them and the predecessor that any inventions which they might perfect while in the employ and working on the time of the predecessor would belong absolutely to the predecessor.   The process which they eventually patented was developed upon the time of the predecessor in its shop and at expense to it. The predecessor, in the absence of any agreement, would have acquired "shop rights" to the invention, but not ownership.   *United States* v. *Dubilier Condenser Corporation,* 289 U. S. 178.   However, Walen and Wilbur, after making the application for a United States patent on which their patent was subsequently granted, entered into a written agreement dated December 18, 1939, with the predecessor under which they granted to the predecessor "a non-exclusive, non-transferable, non-revocable, and royalty free license under any patent or patents that may be granted in the United States on said application [filed May 16, 1939] to use and practice said invention; the above license being for the full term of any patent or patents granted on said

application." . The petitioner argues that the predecessor did not acquire, under the assignment or under any shop rights to which it may. have been entitled, the right to authorize others than itself to use the patented process, but only acquired for itself the right to use and practice the patented process. The Commissioner takes the position that the predecessor, both through shop rights and through the license of December 18, acquired a royalty-free right or license under which those persons who bought salts and equipment from it to be used in the patented process could put those salts and equipment to use by processing ferrous metals under the patented process. He points out that the predecessor had never been engaged in the business of actually processing ferrous metals to give them a colored finish, but had been engaged only in the business of selling salts and equipment to others who desired to process their own metals. He further points out that there was no intention to change the business of the predecessor so as to make it a processor, rather than a seller of salts and equipment for processing. He cites cases to the effect that a shop right is necessarily coextensive with the business requirements of the employer, which has the right to use the patent in such a way and to such extent as may be necessary to benefit it in the business which it is carrying on. He also cites cases to show that a license must be interpreted reasonably to give effect to the intention of the parties in the light of the objects which they must have had in mind in making it. He concludes that neither the shop rights nor the license would have been of any benefit to the predecessor unless it could sell its merchandise with the right on the part of the purchasers to use that merchandise in practicing the patented process. Actually the predecessor, without objection from Walen and Wilbur, did just what the Commissioner says it was entitled to do, and it is our conclusion that that is what the parties intended under the license of December 18, 1939.

The predecessor, on March 7, 1940, transferred to the petitioner its rights under the license of December 18, 1939. The petitioner, prior to that time and thereafter, without objection from Walen and Wilbur, sold its merchandise with the understanding that the purchasers could use the patented process in connection with their use of the merchandise. Walen and Wilbur at all times material hereto had full control of the predecessor and of the petitioner, which were mere tools to carry out their wishes. The conclusion seems inescapable that Walen and Wilbur intended the petitioner to do under the license what it actually was doing.

The question remains, nevertheless, of whether under these and other circumstances now to be mentioned, Walen and Wilbur had any right to ask and receive from the petitioner some payment for this use of their invention. It seems proper to bear in mind, in connec-

tion with all of the steps taken, that these two men were not astute, experienced business men, familiar with corporate affairs, and also that their advisors were not too meticulous in carrying out their purposes. They have testified, without contradiction of any kind, that their intention and understanding had been to have the predecessor, and later the petitioner, make sales of Pentrate and of the equipment, and to permit the purchasers to use those salts and equipment in the patented process, until such time as Walen and Wilbur could determine from the sales and use just how valuable the process would be in the business, after which they would enter into an agreement giving them some fair compensation or reward for that particular use of their patented process. That was a reasonable and sensible way to proceed. Meanwhile, they negotiated unsuccessfully with others in an effort to profit thereby from the invention. It was apparent by 1941 that the petitioner, with the aid of the invention, was able to carry on its business successfully. No doubt, as the Commissioner contends, there were other factors which contributed to the success of that business. Nevertheless, the patented process was one of the more important factors.

The request made by Walen and Wilbur to the petitioner on June 5, 1941, which became a binding contract when agreed to by the petitioner, was inartificially drawn by Norton, who had had no training in law. Walen and Wilbur were in position at that time to have the petitioner agree to almost anything and, consequently, this particular agreement may properly be closely scrutinized to determine its effect for Federal tax purposes. The Commissioner argues that Walen and Wilbur could not demand royalties from the petitioner as provided in the contract of June 5, 1941, and there was no consideration from Walen and Wilbur flowing to the petitioner for the agreement because the petitioner already had a royalty-free right to do what it was doing. Cf. *Thomas Flexible Coupling Co.* v. *Commissioner*, 158 Fed. (2d) 828, in which the patentee had assigned patents, together with future interests, and, as a consequence, royalties paid her by the assignee under a subsequent contract assigning later improvements were without consideration. Since Walen and Wilbur were in complete control and had an understanding all along that they were to be paid for the use of their process after its value had been established, that understanding modified the royalty-free provision of the license and left room for the June 5, 1941, agreement. That agreement was not a sham or entirely lacking in legal requirements, and was not without effect for Federal tax purposes. Cf. *W. N. Thornburgh Manufacturing Co.*, 17 B. T. A. 29; *Ingle Coal Corporation*, 10 T. C. 1199; affd., 174 Fed. (2d) 569; *Granberg Equipment, Inc.*, 11 T. C. 704; *Wall Products, Inc.*, 11 T. C. 51.

A constant effort has been made, in reaching the above conclusions, to determine, from all of the evidence and from observing the witnesses, the intentions of two men unskilled in drafting legal documents and in corporate affairs. Some of the conclusions are not strictly in accordance with the words of the documents used. However, it might be appropriate to point out that the case for the Commissioner would be no stronger if the precise words of the license of December 18, 1939, and the assignment of March 7, 1940, were followed. They gave to the corporations a royalty-free, "non-transferable" license "to use and practice said invention." They, therefore, give force to the petitioner's argument that the corporations had no right to transfer to others, that is, to their customers, the right to use and practice the invention, but could only use and practice the invention by treating metals in their plant. If that was what the parties intended, then there was ample consideration for the agreement of June 5, 1941.

Ordinarily the amounts which a corporation must pay under an agreement for the use of a patent would be deductible in their entirety as ordinary and necessary expenses, and neither the Commissioner nor the Court would have any authority to rewrite the agreement of the parties. But where, as here, the parties contracting with the corporation and the wife of one of those parties hold practically all of its stock and, as a consequence, make the decisions for the corporation, the terms of their agreement may be examined to see whether the amounts to be paid may fairly be regarded as compensation for the use of the patent or represent, to some extent, dividends in disguise. Cf. *L. Schepp Co.*, 25 B. T. A. 419; *Granberg Equipment, Inc., supra; Atlantic Monthly Co.*, 5 T. C. 1025. The Commissioner contends that the payments are entirely distributions of profits. It is extremely difficult, if not impossible, to determine from the record just what would represent reasonable compensation for the use which the petitioner made of the process during the latter part of 1941 and all of 1942, bearing in mind how the process was developed. Walen and Wilbur had not been able to make any arrangement with outside parties for the use of the process prior to 1945. However, the evidence as a whole has some tendency to show that about 5 to 6 cents per pound of Pentrate sold might be a fair measure of reasonable compensation for the petitioner's indirect use of the patented process. The petitioner was able to sell Pentrate for 33 to 35 cents per pound. The cost of manufacture was about 6 cents. Salesmen received about 7 cents per pound. Similar salts could be obtained elsewhere for 12 cents. Obviously, the petitioner had something valuable to offer with Pentrate. Five to six cents for the process would leave a substantial amount for the service given by the petitioner and other factors. Walen and Wilbur had asked but had not gotten 6 cents from strangers. Five cents was

the amount agreed upon with Remington. The petitioner here claims. more than 6 cents, i. e., it claims in addition 10 per cent on equipment sales. No basis for a claim by these two men for a commission on the sales of equipment separate from a claim based upon the use of their process appears. The equivalent of payments up to 5 cents per pound of Pentrate may be deducted and those in excess disallowed, following the principle of *Cohan* v. *Commissioner*, 39 Fed. (2d) 540.

The Commissioner raises an alternative contention under section 24 (c). However, he concedes in his brief that the issue does not require decision as to salaries unless larger deductions than he has allowed are allowed by the Court. Nevertheless, the question does arise as to a part of the amounts due to Walen for 1941 on account of the use of the patent. The entire amount of the so-called royalties accrued in favor of Walen for 1941 and deducted by the petitioner on its return was paid either by check or by note of the petitioner delivered to Walen during 1941 or within 2½ months thereafter and Walen included the full amount in his gross income for 1941. $6,724.14 of the total was paid in 3 negotiable notes payable on demand 90 days after date, with interest at 3 per cent, given to Walen in December, 1941. With the possible exception of a balance of $812.37, the principal of the notes was paid in 1943 and 1944. The $812.37 is not material here, due to the disallowance above of a part of the deduction claimed. The petitioner debited the amounts of the notes to Walen's royalty account and credited them to its notes payable account in December, 1941. The petitioner was solvent at all times and had sufficient cash on hand to pay the notes. The present case is not distinguishable from the following cases which held that the issuance of demand and time notes constituted payment within the meaning of section 24 (c) (1). *Akron Welding & Spring Co.*, 10 T. C. 715; *Musselman Hub-Brake Co.* v. *Commissioner*, 139 Fed. (2d) 65, reversing T. C. Memo., Nov. 10, 1942; *Celina Manufacturing Co.* v. *Commissioner*, 142 Fed. (2d) 449, reversing 47 B. T. A. 967; *Anthony P. Miller, Inc.* v. *Commissioner*, 164 Fed. (2d) 268, reversing 7 T. C. 729; certiorari denied, 333 U. S. 861; *Commissioner* v. *Mundet Cork Corporation*, 173 Fed. (2d) 757, affirming T. C. Memo., June 30, 1948. Decision on this point will be for the petitioner and no part of the deduction already allowed under section 23 (a) need be disallowed because of section 24 (c).

The petitioner has not proven that its failure to make and file an excess profits tax return for 1941 was due to reasonable cause and not to willful neglect, and it follows that the imposition of a 25 per cent addition to the excess profits tax for 1941 can not be disturbed. This case, on that point, is not distinguishable from, and is no stronger for the petitioner than, the case of *P. Dougherty Co.*, 5 T. C. 791; affd., 159 Fed. (2d) 269; certiorari denied, 331 U. S. 838, which estab-

lished the law of this Court, despite an able dissent. *Home Guaranty Abstract Co.*, 8 T. C. 617. Thus, the petitioner is not saved by the fact that its income tax return for 1941 disclosed less income than that which makes the filing of an excess profits tax return necessary. Nor is it saved by the fact that it relied upon Norton, who knew that no excess profits tax return was required unless the excess profits net income amounted to $5,000 or more. The evidence does not disclose that he was in any way qualified to give competent advice upon Federal tax matters or that any responsible person would have had reason to believe that he was. Furthermore, it does not appear that he considered the possible nondeductibility of a part of the salaries and royalties.

*Decision will be entered under Rule 50.*