258 F.2d 343
 Margaret L. LOCKHART, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
ESTATE of Marshall L. LOCKHART, Deceased, Robert W. Matthies, Executor, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
ESTATE of Marshall L. LOCKHART, Deceased, Robert W. Matthies, Executor, and Margaret L. Lockhart, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 12486-12488.
 United States Court of Appeals Third Circuit.
 Argued April 24, 1958.
 Decided July 18, 1958.
 
 Donald M. Dunn, New York City (J. Kenneth Campbell, Richard P. Jackson, New York City, on the brief), for petitioners.
 Melvin L. Lebow, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellee.
 Before MARIS, KALODNER and HASTIE, Circuit Judges.
 MARIS, Circuit Judge.
 
 
 1
 These petitions by Margaret L. Lockhart and Robert W. Matthies, the executor of the estate of her deceased husband, Marshall L. Lockhart, to review decisions of the Tax Court present the question whether certain sums received by the Lockharts in the tax years 1946, 1947, 1948 and 1949 were ordinary income or were gains from the sale of capital assets within the meaning of section 117 of the Internal Revenue Act of 1939, 26 U.S. C. § 117. The monies received were in payment for the assignment of rights in patents for three devices known, respectively, as "Hypospray", a needleless hypodermic syringe for making subcutaneous injections by means of a high velocity spray through the skin, "Hyposeal", a hypodermic syringe disposable after one use, and "Twinpak", a plastic receptacle for the housing of hypodermic needles.
 
 
 2
 The facts as found by the Tax Court are these: From 1928 to 1934 Marshall L. Lockhart was employed as an engineer by the American Telephone and Telegraph Company in Des Moines, Iowa. During that time he filed, together with a co-inventor, a patent application for a switching device known as a selector, which patent was granted in 1936. In 1934 Marshall was on a leave of absence from his employment to develop an idea of his that heart sounds could be graphically photographed. This device, an electrostethograph, for which a patent application had been filed on February 5, 1934, had no connection with his employment. A patent was granted in 1937. In June, 1934, Marshall demonstrated the electrostethograph at the American Medical Association convention in Cleveland, Ohio, in order to interest someone in the manufacture and sale of the device. The Cambridge Instrument Company became interested in the electrostethograph, Marshall granted that company a license in August 1934 to manufacture and sell the device on a royalty basis, and joined the company as a development engineer in order to complete the development of the device and get it in a field-operating condition. Marshall remained with that company until April 1942 personally demonstrating the device to possible purchasers. He also, during this period, endeavored to interest the Postal Telegraph Company in the selector device which he had previously patented.
 
 
 3
 In 1935, while employed by Cambridge Instrument Company, he began work at home on a device which would give a hypodermic injection without the use of a needle. This device, called Hypospray, was not similar to the line of instruments manufactured by his employer. Sometime in 1940 or 1941, while still employed by Cambridge Instrument Company, Marshall demonstrated his Hypospray device to the Squibb Company, which corporation took an option on the device to explore its possibilities. Squibb Company did not have the facilities to manufacture the device and in 1942 it was turned over to the Gelatin Products Company.
 
 
 4
 Marshall joined the staff of the Gelatin Products Company in April 1942 as a consultant and remained there until the end of 1943. While there he worked on the development of the Hypospray device until he was requested to put that work aside in 1943 and work on a substitute for tin used in the Squibb syrette. Marshall developed a substitute, called Hyposeal, using plastic instead of tin. There was no agreement between Marshall and the Gelatin Products Company which required that any development or research work done by him be turned over to that company. During 1943 Marshall, while still employed by the Gelatin Products Company, showed the Hyposeal device to Becton, Dickinson & Company with a view to the possibilities of the device and the extent of its market. At this time there was litigation pending between the Gelatin Products Company and Lockhart as to the ownership of the Hyposeal device, and under a settlement arrangement Gelatin Products Company relinquished all claims to Hyposeal and received an exclusive license to manufacture, use and sell the Hypospray device. Under this license agreement, dated August 11, 1944, Marshall was to receive royalties on the sale of the Hypospray device, with a minimum annual payment of $10,000. He received $10,000 under this exclusive license agreement in 1946.
 
 
 5
 Early in 1944 Marshall was employed by Becton, Dickinson & Company as a consulting engineer, at an annual salary of $6,600, his principal duty being the development of the Hyposeal device. Marshall assigned a one-half interest in the Hyposeal patents to his wife, Margaret, on October 16, 1944. On November 14, 1944, Marshall and Margaret by a letter agreement granted to Becton, Dickinson & Company the "exclusive right to manufacture and sell" the Hyposeal device. Becton, Dickinson & Company paid royalties on the Hyposeal device to Marshall and Margaret from 1946 through the tax years here involved.
 
 
 6
 In 1946 Marshall assigned to Becton, Dickinson & Company for $8,500 his entire right, title and interest in a device patented by him under the name Twinpak.
 
 
 7
 On June 9, 1947, Marshall assigned his rights in the Hypospray devices, subject to the exclusive license previously granted by him to the Gelatin Products Company, to Becton, Dickinson & Company for $135,000, plus 50 per cent of the royalties payable to Becton, Dickinson & Company by Gelatin after Becton, Dickinson & Company had received $135,000. Marshall completed his work on Hyposeal for Becton, Dickinson & Company in December 1947 and left its employ at that time. During the years 1936 through 1955 approximately 37 patents were granted to Marshall, some representing refinement of basic inventions but at least 15 being for basic devices.
 
 
 8
 Marshall and Margaret filed individual income tax returns for the tax years 1946 and 1947 and filed joint returns for the tax years 1948 and 1949. Marshall died in 1954 and Robert W. Matthies, as executor of his estate, was substituted in his stead. The Commissioner of Internal Revenue determined that the income derived from the sale or license of the patents here involved was ordinary income, and determined deficiencies in federal income taxes as follows:
 
 
 9
 Margaret L. Lockhart ........... 1946 $ 2,639.92
 1947 8,897.06

 Estate of Marshall L. Lockhart,
 Deceased, Robert W. Matthies,
 Executor ....................... 1946 5,944.69
 1947 70,861.98

 Estate of Marshall L. Lockhart,
 Deceased, Robert W. Matthies,
 Executor, and Margaret L.
 Lockhart ...................... 1948 2,775.34
 1949 20,637.62
 
 
 10
 Upon review by the Tax Court the Commissioner's determination was sustained upon the ground that Marshall was a professional inventor, that he was in the business of selling and licensing his inventions, and that consequently the payments received by him and Margaret during the years 1946 through 1949 from the transfer of the three basic patents were taxable as ordinary income. The petitioners contend that this was error and that the payments received by Marshall and Margaret were actually receipts from the sale of capital assets within the meaning of section 117 of the Internal Revenue Code of 1939 and should have been so treated for income tax purposes.
 
 
 11
 We shall consider first the contentions of the petitioners in respect to Marshall's tax liability. They urge that the Tax Court erred in finding that he was a professional inventor and argue that his patents were capital assets within the meaning of section 117. That section, in pertinent part, provides:
 
 
 12
 "§ 117. Capital gains and losses
 
 
 13
 "(a) Definitions. As used in this chapter —
 
 
 14
 "(1) Capital assets. The term `capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include —
 
 
 15
 "(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;".
 
 
 16
 The petitioners do not quarrel with the evidentiary findings of the Tax Court but contend that the conclusions drawn therefrom are contrary to the weight of authority. They cite decisions which they contend support the proposition that the sale of a limited number of patents over a long period of years does not constitute the conduct of the business of selling patents and that under those cases the proceeds of the transactions here involved should have been treated as capital gains and not as the proceeds of property held primarily for sale in the ordinary course of business. It is true that the courts have in many instances determined that an inventor-taxpayer did not hold his inventions primarily for sale in the ordinary course of business, but those cases afford no rule for the decision of this one. As a matter of fact there is no fixed rule or formula for determining whether particular property sold by a taxpayer was held primarily for sale in the ordinary course of his business. As this court pointed out in Curtis Company v. Commissioner of Internal Revenue, 3 Cir., 1956, 232 F.2d 167, 170, "A legislative attempt to draw a distinction between the tax on capital gain and ordinary income must necessarily produce a puzzling line of decisions for the facts are as variable as human activities." Accordingly, to determine whether the activities of a taxpayer constitute carrying on a business requires an examination of the facts of the particular case. Higgins v. Commissioner, 1941, 312 U.S. 212, 217, 61 S.Ct. 475, 85 L.Ed. 783. See also Commissioner of Internal Revenue v. Stokes' Estate, 3 Cir., 1953, 200 F.2d 637, 638; Avery v. Commissioner, 1942, 47 B.T.A. 538, 541, and annotation, 46 A.L. R.2d 615, 738-745.
 
 
 17
 In construing the term "capital assets" the Supreme Court tells us that the statutory definition must be narrowly applied and its exclusions interpreted broadly. Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29. And there is usually no single factor which is decisive. Consolidated Naval Stores Company v. Fahs, 5 Cir., 1955, 227 F.2d 923, 926. For there are ordinarily factors casting weight upon both sides of the question which make the issue a close one. Gamble v. Commissioner of Internal Revenue, 5 Cir., 1957, 242 F.2d 586, 590. The activity need not be the taxpayer's sole occupation nor take all his time. Snell v. Commissioner of Internal Revenue, 5 Cir., 1938, 97 F.2d 891, 892; Harvey v. Commissioner of Internal Revenue, 9 Cir., 1949, 171 F.2d 952, 954. There should, however, be evidence of a "continuity of sales and sales related activity over a period of time." Dunlap v. Oldham Lumber Co., 5 Cir., 1950, 178 F.2d 781, 784.
 
 
 18
 The Tax Court in its opinion characterized Marshall's activities as follows:
 
 
 19
 "Marshall's sustained activities in developing and pushing the acceptance of his various patents convinces us that this was a business enterprise. We are persuaded that this was Marshall's intent. From 1934, when he left the employ of the American Telephone and Telegraph Company to develop an idea, later patented, that heart sounds could be graphically photographed, to the years involved here, he followed quite a definite pattern of developing ideas, generally in the medical field, interesting some manufacturer in the idea, joining the staff of such manufacturer to develop that idea, and granting to the manufacturer exclusive licenses to the patents arising from such ideas. There was nothing sporadic about this activity. Usually, while Marshall was perfecting one device with a manufacturer, he was already venturing out on other devices and seeking to interest still other manufacturers in the new devices. Nor were there, as a rule, any agreements between Marshall and the various manufacturers who employed him to develop his inventions, that any new inventions developed while in a manufacturer's employ would belong to that manufacturer. Marshall's salary, it should also be noted, was always separate and apart from any royalty payments received under the exclusive license agreements entered into for the various inventions. Over a period of years, from 1936 through 1955, approximately 37 patents were granted to Marshall, and while some of these are refinements of basic patents, we have found that at least 15 of such patents were for basic inventions. It is certain to us, from an examination of these facts, that Marshall was in the business of selling and licensing his inventions, and that, consequently, the payments received by him and his wife, Margaret, during the years 1946 through 1949, from the transfer of the three basic inventions, are taxable as ordinary income."
 
 
 20
 The petitioners contend that the Tax Court erred in thus concluding that the character of Marshall's activities constituted the business of selling or licensing his patents. Furthermore, they urge that the Tax Court erred in considering the entire period from 1936 through 1955 during which Marshall had 37 patents granted to him, of which 15 were for basic inventions, instead of limiting its consideration to his patent activities up to 1949, during which time he had issued to him only 7 of the 15 basic patents enumerated by the Tax Court. It is clear, however, that Marshall's patent activities in both prior and subsequent years were material to the understanding of the nature of his activities during the taxable years and the Tax Court was accordingly entitled to consider them for this purpose. Ehrman v. Commissioner, 9 Cir., 1941, 120 F.2d 607, 610, certiorari denied 314 U.S. 668, 62 S.Ct. 129, 86 L.Ed. 534. We conclude that the Tax Court's determination that Marshall during the taxable years in question was in the business of selling and licensing his inventions is supported by ample evidence and must be sustained. It follows that the patents in Marshall's hands were not to be regarded as capital assets, or the profits from their sale by him as capital gains.
 
 
 21
 The petitioners object that this conclusion is unfair in view of the enactment of section 1235 of the Internal Revenue Code of 1954, 26 U.S.C. § 1235 and the addition of subsection (q) to section 117 of the Internal Revenue Code of 1939 which eliminated from and after May 31, 1950 the distinction between a professional and amateur inventor so as to treat the sale of patents by each of them as the sale of capital assets. It is true that in view of the subsequent legislation the result arrived at in this case may appear to be harsh but any remedy is for Congress and we must apply the law as we find it.
 
 
 22
 Turning to consider Margaret's tax liability our first problem is to determine whether the grant of rights in the Hyposeal patents by her was a sale of capital assets within the meaning of section 117. It will be remembered that the Tax Court found that Marshall had assigned a one-half interest in the Hyposeal patents to Margaret on October 16, 1944 and that on November 14, 1944, Marshall and Margaret granted Becton, Dickinson & Company the exclusive right to manufacture and sell the device. It is undisputed that Margaret was a bona-fide owner of a one-half interest in the patents for the Hyposeal device, exercising the control of an owner. Nelson v. Ferguson, 3 Cir., 1932, 56 F.2d 121, certiorari denied 286 U.S. 565, 52 S.Ct. 646, 76 L.Ed. 1297; Commissioner of Internal Revenue v. Reece, 1 Cir., 1956, 233 F.2d 30; 2 Mertens, Law of Federal Income Taxation § 18.14. Compare Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923, and Commissioner of Internal Revenue v. Sunnen, 1948, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898. The Tax Court, however, failed to make any finding in respect to Margaret's interest in the patents, placing her in the same category as her husband, Marshall. But Margaret was not an inventor, this being the only interest in patents which she possessed, so far as the record shows, and the petitioners contend that her interest must, therefore, be recognized as a capital asset, and the transfer of that interest as the sale of a capital asset, within the meaning of section 117.
 
 
 23
 It appears that the informal letter agreement of November 14, 1944 between the Lockharts and Becton, Dickinson & Company which transferred the rights in the Hyposeal patents in terms granted only the right to manufacture and sell the Hyposeal device and did not mention the right to use it. The Commissioner accordingly contends that under the rule laid down in Waterman v. Mackenzie, 1891, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923, the failure to grant the use of the device as well as the right to manufacture and sell it stamped the transaction as the grant of a license only and not as a sale of the patents within the purview of section 117. We do not think, however, that the omission of the term "use" was fatal in this respect. The Waterman case involved the right of the licensee to sue an infringer. The rule of that case has not been strictly applied by the courts in federal tax cases. In such cases the courts look to the realities of the situation rather than to its form. If the grantor has evidenced an intention to surrender to the transferee substantially all his rights in the patent, imperfections in draftsmanship, or the failure to use particular words do not control, and it has been held that, for income tax purposes, the transaction has effected a sale. Commissioner of Internal Revenue v. Celanese Corp., 1944, 78 U.S.App. D.C. 292, 140 F.2d 339; Allen v. Werner, 5 Cir., 1951, 190 F.2d 840; Lawrence v. United States, 5 Cir., 1957, 242 F.2d 542; Rollman v. Commissioner of Internal Revenue, 4 Cir., 1957, 244 F.2d 634; Parke Davis & Co. v. Commissioner, 1934, 31 B.T.A. 427, 431-432; Reid v. Commissioner, 1956, 26 T.C. 622, 632. See also Senate Report No. 1622, 83d Cong. 2d Sess., pp. 439-440.
 
 
 24
 As was pointed out by Judge Soper in Rollman v. Commissioner of Internal Revenue, 4 Cir., 1957, 244 F.2d 634, 639, a case involving a patent on footwear:
 
 
 25
 "These rights seem to us to amount to full and complete control, for the omission from the contract of the express right to use the patented article did not in any way limit or restrict Rikol in its operations under the patent, or reserve any right of practical value to The Rollmans. No one in the pending case has ventured to suggest what use The Rollmans can make of the shoes manufactured under the patent other than to wear them; but this was a right to which every purchaser from Rikol was entitled to enjoy; nor has any one been able to suggest what use the manufacturers could make of the footwear and of the patent rights other than to manufacture the shoes and sell them to the general public."
 
 
 26
 The Commissioner points to the fact that the agreement of November 14, 1944 between the Lockharts and Becton, Dickinson & Company called for royalty payments depending on the amount of sales and argues that this is a factor foreign to the concept of a sale and purchase. This argument was rejected by the Tax Court in Myers v. Commissioner, 1946, 6 T.C. 258, a case acquiesced in by the Commissioner, 1946 -1 C.B. 3, during the time here involved. While the Commissioner withdrew his acquiescence after May 31, 1950, 1950-1 C.B. 7, 9, his action in so doing was reversed by Congress by the Act of June 29, 1956, 70 Stat. 404, which added subsection (q) to section 117 of the Internal Revenue Code of 1939, and was not in any case applicable to the taxable years here involved. The rule laid down in the Myers case is accordingly controlling here. See Massey v. United States, 7 Cir., 1955, 226 F.2d 724, and Rollman v. Commissioner of Internal Revenue, 4 Cir., 1957, 244 F.2d 634. We conclude that the transfer by the Lockharts of their rights in the Hyposeal device amounted to a sale of the patents and that in the case of Margaret who was not in the business of selling patents it was a sale of a capital asset within the meaning of section 117. The Tax Court accordingly erred in treating the moneys received by Margaret from the sale of her interest in the patents as ordinary income.
 
 
 27
 The decision of the Tax Court in our No. 12,487 will be affirmed. The decisions in our Nos. 12,486 and 12,488 will be reversed and remanded for further proceedings not inconsistent with this opinion.