Finn H. MAGNUS and Elsie A. Magnus, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 12470.

United States Court of Appeals Third Circuit.

Argued April 22, 1958.

Decided Oct. 7, 1958.

Jerome Stein, Newark, N. J., for petitioners.

Louise Foster, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attorneys, Dept. of Justice, Washington, D.C., on the brief), for respondent.

Before MARIS, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

Finn H. Magnus ("taxpayer") [1] and Elsie A. Magnus, husband and wife, residents of New Jersey, instituted this action in the Tax Court for a redetermination of a tax deficiency of $14,387.40 assessed for calendar year 1951. The questions presented concern the nature of payments in the amounts of $18,638.76 and $11,437.22 received by taxpayer in 1951 from a corporation then controlled by him, Magnus Harmonica Corporation ("Magnus"), known, prior to 1947 as International Plastic Harmonica Corporation ("International"). The Tax Court determined that such payments were taxable as ordinary income and rejected taxpayer's argument that they constituted capital gain because made in consideration of the transfer of certain patents and patent applications to International in 1944–45.[2] This petition for review of the Tax Court's decision followed.

The facts, as stipulated and as found by the Tax Court, may be summarized as follows:

Taxpayer developed certain inventions pertaining to the construction of plastic

[1]. Mrs. Magnus is a party to this suit because a joint income tax return was filed.

[2]. The Opinion of the Tax Court is reported at 1957, 28 T.C. 898.

reed plates and plastic reeds for harmonicas and applied for patents in the United States, during the period June 18, 1942 to March 17, 1944.

On January 15, 1944 taxpayer granted an exclusive license to Harmonic Reed Corporation ("Harmonic") to manufacture harmonicas in North and South America. The contract provided, among other things, for taxpayer's employment by Harmonic and included a paragraph permitting termination of the license in the event Harmonic defaulted in the payment of royalties, salary or other sums for a period of three months.

On December 27, 1944 taxpayer revoked Harmonic's license because of an alleged breach of contract. Harmonic ignored the revocation and continued to manufacture and sell the harmonicas.

Subsequent to this revocation taxpayer and Peter Christensen ("Christensen"), his former employer, entered into negotiations for the exploitation of taxpayer's patents. Taxpayer was not represented by counsel. Christensen agreed to invest $25,000 in a new corporation, International, to exploit taxpayer's patents, but only on condition that taxpayer would grant absolutely to Christensen during the life of the patents one-half of the royalties due to taxpayer. Taxpayer agreed to this condition.

On December 29, 1944, as a result of these negotiations, taxpayer entered into a written agreement, drawn by Christensen's attorney, which provided for the creation of International, (1) for the sale, assignment and transfer by taxpayer to International of all his right, title and interest in and to his chromatic harmonica and plastic harmonica inventions, his existing American patents, and his applications for American, Great Britain and Canadian patents and (2) International was to have 2500 shares authorized capital stock, 250 of which was to be issued to Christensen for $25,-000 and 250 to taxpayer in consideration of his services and his assignment to International of his patents and patent applications, above referred to. The agreement also provided:

"10. * * * [International] shall pay to Magnus [taxpayer] and Christensen in equal shares, during the life or term of said patents and patent applications * * * royalties upon the musical instruments manufactured and sold * * * at the rates hereinafter set forth to wit: ½ cent for each musical instrument, or any part thereof, sold, as shown by copies of customers sales invoices, at a price not over 50 cents per musical instrument or part thereof, and 1 cent for each musical instrument or part thereof, sold, as shown by copies of customers sales invoices at a price exceeding 50 cents per musical instrument or part thereof.

    *      *      *      *      *      *

"In case of Magnus's [taxpayer's] death, or Christensen's death, said royalties shall be paid to the respective executor or administrator of the one so dying."

Additionally, the agreement provided for the employment of both taxpayer and Christensen at an annual salary of $15,000 for a term of two years and for additional one year periods unless cancelled by either party on three months notice; taxpayer was to cooperate in taking all necessary proceedings to "vindicate and protect" the patents or patent applications and in default International was authorized to so act and "All sums received, collected or recovered in any such suit whether by decree, judgment, settlement, or otherwise" were to be paid to International.

The last paragraph of the agreement (No. 12) provided that taxpayer could terminate the agreement if International and Christensen defaulted in the payment of salary, royalties or other sums for a period of thirty days. In that event title to the patents and applications was to revert to taxpayer. The paragraph concluded as follows:

"This agreement shall remain in effect for a period of two years from January 1, 1945, and in the event that neither party give the other

three months prior notice in writing of the desire to terminate same, this agreement shall thereafter continue in full force and effect and upon the same terms and conditions for an additional period of one year and so on from year to year unless either party gives the other three months prior written notice terminating this agreement at the end of any extended yearly period.

"(a) Should * * * [taxpayer] give notice of terminating the working agreement provided herein the salary paid to * * * [taxpayer] shall cease at the end of said yearly term, or on the date that * * [taxpayer] ceases to serve * * * [International].

"(b) Should * * * [International] give such a notice to * * * [taxpayer] terminating the agreement the salary of said * * * [taxpayer] shall cease on the expiration of the yearly term."

On February 27, 1945, taxpayer executed an "Assignment" under which he "sold, assigned and transferred" to International all his "right, title and interest" in his inventions, letters patent, and patent applications. By this same instrument he transferred to International "all claims and demands * * * for damages or profits accrued or which may accrue on account of any infringement" of the patents and patent applications so transferred. International was empowered "to sue for and collect the same." The assignment was recorded in the United States Patent Office on March 31, 1945.

The transfer of patent interests and payment of $25,000 to International in accordance with these agreements was reflected on International's books of account by debits to cash and patents of $25,000 each. Capital stock was credited with $50,000 for 500 shares of stock is-sued therefor on June 25, 1945; 250 shares to taxpayer and 250 shares to Christensen.

Christensen transferred his 250 shares of stock, among other assets, to a trust created May 9, 1946 for his sole benefit. On May 17, 1946, the trustees sold this stock, 50 shares to taxpayer and 200 shares to International. On May 18, 1946 International issued 25 shares to John E. Toolan, 50 shares to Arthur Blumenschine and 25 shares to taxpayer. Later in 1946 Blumenschine's shares were reacquired by International and taxpayer sold Toolan 62½ shares. From the end of 1946 through 1951 taxpayer held 261½ shares, his wife one share and Toolan 87½ shares. The remaining 150 shares issued were retained as Treasury stock. Neither Christensen nor his trustees held any stock in International or Magnus (the successor corporation) following the sale on May 17, 1946. The corporations did, however, continue to make royalty payments to the Christensen trust until Christensen's death in April 1952 under the agreement of December 29, 1944, as amended and clarified by agreements dated August 6, 1946, September 5, 1946, September 20, 1946 and December 14, 1946.

The first of the so-called clarifying contracts was entered into by taxpayer, Christensen's trustees and International on August 6, 1946, to specifically provide that any royalties paid by the Canadian interests then negotiating with International should be distributed in equal shares to taxpayer and the Christensen trust. On September 5, 1946, the original agreement was again modified to make clear that taxpayer and the Christensen trust were each to receive the royalties specified in the December 29, 1944 agreement "on each Magnus harmonica sold by International." [3] By a third agreement dated September 20, 1946 the trustees relinquished certain

---

3. Apparently there was some question whether, under the then existing agreement, taxpayer and Christensen were each entitled to one half cent on harmonicas sold for 50 cents or less and one cent for instruments sold at a price in excess of 50 cents or whether, instead, they were required to share the specified royalties of one half and one cent.

rights under various contracts with taxpayer, International and others, retaining, however, the right to receive royalties under the December 29, 1944 agreement on each Magnus harmonica for the life of the patents and applications or during Christensen's lifetime, whichever was shorter. (The original agreement did not provide for the termination of royalty payments at Christensen's death.) The contract of December 14, 1946, by way of reaffirmation, provided that International was to pay equal royalties to taxpayer and Christensen except that the payments to Christensen were to terminate at his death whereas taxpayer's rights were to continue during the life of the patents.

International instituted suit against Harmonic for infringement and unfair competition on November 7, 1945. International asked the District Court to adjudge that the exclusive license agreement of January 15, 1944, between taxpayer and Harmonic was terminated and that International was the sole owner of the "whole right, title and interest" in three patents. The litigation ended in a settlement by the parties which was incorporated in a decree of the District Court dated December 20, 1946.[4] By this settlement agreement International granted Harmonic a "personal non-exclusive and non-assignable license to manufacture and sell harmonicas and reed plates and reeds for harmonicas" as limited therein. The agreement, set out in more detail in the Opinion of the Tax Court,[5] further provided for the payment of royalties to International "for the account of Magnus [taxpayer]" during the life of the patents. Such royalties were to be halved in the event of Christensen's death and otherwise adjusted to conform with any change in the terms of the then existing royalty agreement between taxpayer, International and the Christensen trust.

In 1951 Harmonic paid to Magnus (the corporate name was changed from International Plastic Harmonica Corporation to Magnus Harmonica Corporation on June 23, 1947, as previously stated) a total of $11,437.22 for the account of taxpayer in accordance with the settlement agreement. Magnus, in turn, paid this sum to taxpayer. The payment was not taken as a deduction for federal income tax purposes and it was never included in Magnus's gross income. Magnus also paid taxpayer $18,638.76 under the royalty agreement of December 29, 1944, as amended. Taxpayer reported as long-term capital gain the receipt of $11,437.22 from Harmonic and $18,638.76 from Magnus in his federal income tax return for 1951. Similar payments received prior to 1951 were also reported as long-term capital gain but were not questioned by the Internal Revenue Service.

The Tax Court determined that the $18,638.76 payment constituted a dividend taxable as ordinary income. The determination was premised on its finding that the total consideration paid by International for the transfer of taxpayer's patent interest was the 250 shares of stock which it issued.[6] The Court held that the $11,437.22 was also ordinary income without deciding whether taxpayer "was deemed to have certain rights personally in the license granted to Harmonic * * * or whether this was merely a device to camouflage dividend payments by International" since neither theory would have resulted in a capital gain.[7]

Taxpayer contends that both payments are capital gains because made in con-

---

4. The Decree of the District Court is unreported but is included in the Record, along with the settlement agreement, as Exhibit 11–J.

5. 28 T.C. 898, 899.

6. It is not clear from a reading of its Opinion whether the Tax Court found that

taxpayer sold his patent interests in consideration of the issuance of 250 shares of stock or made a capital contribution and not a sale (as stated in a subsequent decision of the Court, Hickman v. Commissioner of Internal Revenue, 29 T.C. 864).

7. 28 T.C. 898, 899.

sideration of the sale of the harmonica patents to International. The Commissioner urges that the royalties paid by International and Magnus were no more than disguised dividends by which the corporations sought to bail out profits at capital gains rates. As to the $11,437.22 he contends, in addition, that taxpayer effectively transferred to International any interest he might have had in sums recovered as a result of an infringement suit whether by judgment or settlement. In the alternative the Commissioner contends generally that the transfer of patents to International constituted a license, not a sale, and that the sums received are therefore taxable as ordinary income for that additional reason. It is not disputed that the patent interests constituted capital assets held for more than six months.

Taxpayer relies primarily on section 117(q) of the Internal Revenue Code of 1939,[8] added to the Code in 1956 and applicable to payments made after May 31, 1950 regardless of when the patents were transferred. That section provides in part that a transfer of "all substantial rights to a patent," constitutes "the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are * * * payable periodically over a period generally coterminous with the transferee's use of the patent, or * * * contingent on the productivity, use or disposition of the property transferred."[9]

■ The first question presented is whether the agreements in question transferred "all substantial rights" to the patents. The requirement of patent title law that such a transfer include the right to make, use and sell[10] has frequently been adopted in determining this question.[11] But a more flexible rule has been applied by some courts, including this Circuit, and accordingly our in-

8. "Sec. 117. Capital Gains and Losses," Internal Revenue Code of 1939, as amended, follows in part.

"(q) Transfer of Patent Rights.—

"(1) General rule.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(B) contingent on the productivity, use, or disposition of the property transferred.

"(2) 'Holder' defined.—For purposes of this subsection, the term 'holder' means—

"(A) any individual whose efforts created such property, or

"(B) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practise of the invention covered by the patent, if such individual is neither—

"(i) the employer of such creator. nor

"(ii) related to such creator (within the meaning of paragraph (3)).

* * * * *

"(4) Applicability.—This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred." 26 U.S. C.A. 1955 ed., Sec. 117(q), as amended June 29, 1956, 70 Stat. 404.

9. This provision codifies the decision of Tax Court in Myers v. Commissioner of Internal Revenue, 1946, 6 T.C. 258 for tax years beginning after May 31, 1950 and before January 1, 1954. The same rule is applicable to payments received in 1954 and thereafter under Section 1235 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1235. For statutory background see Rollman v. Commissioner of Internal Revenue, 4 Cir., 1957, 244 F. 2d 634, 640–641; Coplan v. Commissioner of Internal Revenue, 1957, 28 T.C. 1189.

10. Waterman v. Mackenzie, 1891, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923.

11. Broderick v. Neale, 10 Cir., 1953, 201 F. 2d 621; Gregg v. Commissioner of Internal Revenue 1952, 18 T.C. 291, affirmed per curiam, 3 Cir., 1953, 203 F. 2d 954; Cleveland Graphite Bronze Co. v. Commissioner of Internal Revenue,

quiry is aimed at ascertaining only whether rights amounting to full and complete control were relinquished.[12] A transfer of something less constitutes a mere license with the royalties or other payments received thereunder taxable as ordinary income.[13]

Paragraph 12 of the agreement of December 29, 1944 provides first that if the royalties or other payments provided therein are not paid within thirty days the taxpayer may terminate the agreement upon written notice. The same paragraph states that "this agreement shall remain in effect for a period of two years from January 1, 1945" and then adds that "in the event that neither party gives the other three months prior notice in writing of the desire to terminate same, this agreement shall thereafter continue in full force and effect."

■ The decisions in Myers v. Commissioner of Internal Revenue, 1946, 6 T.C. 258 and subsequent tax cases have applied the principle developed in patent title law that provisions for the revesting of title in the assignor of a patent interest upon a condition subsequent are not inconsistent with a sale or exchange of all substantial rights.[14] Transactions have been treated as a sale or exchange when the agreement of transfer provided for a termination upon the default of the assignee in the fulfillment of the contract obligation,[15] upon bankruptcy or receivership of the assignee,[16]

or upon an option in the assignee to terminate.[17] On the other hand, the courts have held that an agreement providing for termination at will of the so-called assignor constitutes a mere license.[18]

Paragraph 12, earlier detailed, reserves to taxpayer the right to terminate the agreement upon the happening of certain conditions subsequent and in this respect does not derogate from taxpayer's argument that the agreement constitutes a sale or exchange. But in addition, the Commissioner asserts taxpayer is given the absolute right to revoke the entire agreement at will at the end of the first two year period and thereafter at the end of each year. This, it is said, renders the instrument a mere license.

Taxpayer contends this provision concerns only the termination of his employment with International. In this connection he points to such indicia of an outright sale as: frequent reference to the term "assignment" throughout the agreement; the absolute "assignment" which followed on February 27, 1945; the sizeable investment made by Christensen; and the absence of a condition that the right to manufacture and sell continues in the event taxpayer elected to terminate such as is found in Paragraph 9(a) of the license agreement with Harmonic.[19]

1948, 10 T.C. 974, 989, affirmed per curiam, 6 Cir., 1949, 177 F.2d 200.

12. Lockhart v. Commissioner of Internal Revenue, 3 Cir., 1958, 258 F.2d 343; Rollman v. Commissioner of Internal Revenue, supra, note 9.

13. Broderick v. Neale, supra note 11.

14. Waterman v. Mackenzie, supra, note 10, 138 U.S. at page 256, 11 S.Ct. at page 335.

15. Dairy Queen of Oklahoma, Inc., v. Commissioner of Internal Revenue, 10 Cir., 1957, 250 F.2d 503; Lawrence v. United States, 5 Cir., 1957, 242 F.2d 542, 545; Allen v. Werner, 5 Cir., 1951, 190 F.2d 840, 842; Lamar v. Granger, D.C.W.D.

Pa.1951, 99 F.Supp. 17, 37–38; Myers v. Commissioner of Internal Revenue, supra, note 9, 6 T.C. at page 264.

16. Commissioner of Internal Revenue v. Celanese Corp., 1944, 78 U.S.App.D.C. 292, 140 F.2d 339; Lamar v. Granger, supra, note 15.

17. Lawrence v. United States, supra, note 15; Allen v. Werner, supra, note 15.

18. Gregg v. Commissioner of Internal Revenue, 1952, 18 T.C. 291, 302, affirmed per curiam, 3 Cir., 1953, 203 F.2d 954.

19. Taxpayer further argues that the Decree of the District Court dated December 30, 1946, in the infringement action by International against Harmonic

The provisions for termination of the agreement are ambiguous at best. But the agreement, as a whole, when viewed in the context of the declared intentions of the parties as testified to by taxpayer, leads us to the conclusion that the language used did not vest in the taxpayer a right to terminate the agreement at will. Accordingly we are of the opinion that the agreement effectively transferred all substantial rights to the patents and applications within the meaning of section 117(q).

That brings us to the specific question whether the payment of $18,638.76 pursuant to the agreement of December 29, 1944, constituted a disguised dividend taxable as ordinary income. The Tax Court answered the question as follows: [20]

"* * * We are persuaded that the two parties, petitioner [taxpayer] and Christensen, were, under the agreement of December 29, 1944, making capital contributions to International in return for equal portions of that corporation's stock. Once the letters patent and patent applications were transferred to International as capital contributions, there could be no reason for the corporation to assume an obligation to pay royalties for the use of such assets. We cannot see what consideration passed to the corporation in return for this obligation assumed by it. * * * The agreement here was obviously not at arm's length, and we are convinced that under

such agreement an unnecessary obligation was placed upon International."

The Courts have frequently stated that the treatment of a transfer of patent interests as a sale or exchange is not governed by the language or form of the agreement of transfer.[21] The same principle is applicable to such agreements between a corporation and its shareholders with the caveat that the amounts payable thereunder should be carefully scrutinized to determine whether they constitute consideration for the sale of a patent or are merely disguised dividends.[22] The Tax Court has pointed out that payments by a controlled corporation to its incorporating stockholders are not necessarily to be treated as disguised dividends when made pursuant to an agreement, contemporaneous with the incorporation, under which a patent is transferred to the corporation. Hickman v. Commissioner of Internal Revenue, 29 T.C. 864. There, the Court distinguished the Tax Court's decision in the instant case on the ground that "the patent [in Magnus] was not sold to the corporation by one of its two controlling stockholders, but instead was transferred to the corporation as a capital contribution."

Taxpayer's first transfer of an interest in his patents occurred on January 15, 1944. By an agreement of that date he granted Harmonic an exclusive license to manufacture harmonicas under his patents in North and South America. In consideration therefor Harmonic

(Finn H. Magnus, taxpayer here, was joined as co-defendant) insofar as it incorporates the settlement agreement of December 16, 1946, constitutes a judicial determination that International owned the entire right, title and interest in and to all patent applications and patents received by International under the agreement dated December 29, 1944.

20. 28 T.C. 898, 899.

21. Lockhart v. Commissioner of Internal Revenue, supra, note 12; Switzer v. Commissioner of Internal Revenue, 6 Cir., 1955, 226 F.2d 329; Watson v. United States, 10 Cir., 1955, 222 F.2d

689; Reid v. Commissioner of Internal Revenue, 1956, 26 T.C. 622, 632.

22. Stearns Magnetic Manufacturing Co. v. Commissioner of Internal Revenue, 7 Cir., 1954, 208 F.2d 849; Champayne v. Commissioner of Internal Revenue, 1956, 26 T.C. 634, 645; Magee-Hale Park-O-Meter Co. v. Commissioner of Internal Revenue, 1956, 15 T.C.M. 254; Differential Steel Car Co. v. Commissioner of Internal Revenue, 1951, 16 T.C. 413, 423; Heatbath Corp. v. Commissioner of Internal Revenue, 1950, 14 T.C. 332, 347; Coplan v. Commissioner of Internal Revenue, supra, note 9.

agreed (1) to employ taxpayer for two years and for additional one year periods at an annual salary of $15,000; (2) to pay taxpayer a royalty of one cent for each harmonica sold; and (3) to deliver to taxpayer 5,000 shares of its common stock having a par value of fifty cents per share. Harmonic was not controlled by taxpayer nor was he related to any of its stockholders.

The contract of December 29, 1944 between taxpayer, Christensen and International closely parallels that agreement. By its terms International issued 250 of its shares to taxpayer "upon the transfer of a duly executed assignment of * * * [certain patent interests], and in consideration of the services rendered by * * * [taxpayer]" (Paragraph 2). The assignment and employment are also subjects of separate provisions—paragraphs 4 and 9, respectively. Then, in paragraph 10, the critical royalty provisions are set out.

Taxpayer testified that the parties intended a three-fold consideration for the transfer of his patent interests—the issuance of stock, the employment contract, and the designated royalties. With respect to the royalties he stated he initially demanded one cent on all harmonicas sold at a price not to exceed 50 cents and two cents on all such instruments sold at a price in excess of 50 cents. He agreed, however, to assign one-half of these royalties to Christensen in order to induce him to invest the necessary $25,000 in International. This explains the use of the term "royalty" to describe payments to Christensen who had no interest in the patents although we need not and do not pass on the tax nature of these payments.

The minutes of a meeting of International's directors (taxpayer and Christensen were directors) convened on December 29, 1944, for the purpose of accepting taxpayer's offer to transfer his patent interest, also discloses that the royalties were included in the consideration flowing to taxpayer. The agreement was interpreted by the directors as transferring taxpayer's entire interest in the harmonica patents to International in consideration of the issuance of 250 shares of stock and "for the royalties, salary, and other considerations agreed to be paid" (Stipulation of Facts No. 6).

There is still another reason for concluding that the royalty payment of $18,-638.76 did not constitute a disguised dividend. Magnus continued to make similar payments to the Christensen trust following the sale of Christensen's 250 shares of stock and until Christensen's death in April 1952. These payments, totally unrelated to stock holdings, were made pursuant to the December 29, 1944 agreement as modified and clarified by the parties thereto.

The cases relied on by the Tax Court —Ingle Coal Corporation v. Commissioner of Internal Revenue, 1948, 10 T.C. 1199, affirmed 7 Cir., 1949, 174 F.2d 569; Crabtree v. Commissioner of Internal Revenue, 1954, 22 T.C. 61, affirmed per curiam 2 Cir., 1955, 221 F.2d 807— in determining that the royalty payments constituted disguised dividends are inapposite. In Ingle a closely held family corporation in the business of mining coal on property leased from third persons, distributed all its assets to its shareholders. They, in turn, transferred the assets to a newly organized corporation in return for stock in that corporation and an "overriding" royalty of $5.00 per ton in proportion to their stock holdings in the old company. In determining that the royalty payments were dividends and therefore not deductible in computing taxable income the Court stated as follows:

"Here the liquidation distribution was but one step in the integrated parts of a single transaction by which one wholly owned corporation was substituted for another. The petitioner [new corporation] had the same assets and the same liabilities and stockholders as its predecessor, except that in creation of the new corporate set-up petitioner assumed an obligation to make additional royalty payments to those same stockholders."

In Crabtree, two automobile dealers transferred an automobile sales franchise to a newly organized corporation in return for all the stock and an agreement of the corporation to pay them fifty per cent of the net profits after income taxes over a ten-year period. At all times during the ten-year period, including the tax year in issue, the stock of the corporation was owned equally by the taxpayer and his partner. The Court there determined that the stock itself constituted full and adequate consideration and that the provision for paying out fifty per cent of the profits for ten years was merely an anticipatory arrangement for the distribution of corporate profits.

Neither of these cases concern the sale of patents nor relate to the body of law which enunciates the principle that the transfer of a patent constitutes a sale or exchange even when the consideration is payable periodically over the useful life of the patent or is contingent on the productivity, use or disposition of the property transferred. More particularly, the facts of both Ingle and Crabtree lead inescapably to the conclusion that the owners of the two profitable businesses there involved were merely attempting to drain off corporate profits at capital gains rates. On the other hand, in the instant case, at the time the agreement was executed, the inventions in question were not reduced to practice and there was no immediate prospect of their successful commercial use. Nor can we spell out from the payment of so small a royalty any intention to disguise dividends. To the contrary, the testimony discloses that the gross and net profit margins on the harmonicas in question were much higher than the royalty payments. We are satisfied that these payments were reasonable in amount and when coupled with the issuance of stock and the employment contract, fairly compensated taxpayer for his inventive efforts.

For the reasons stated we are of the opinion that the Tax Court erred in its ruling that the $18,638.76 payment was ordinary income and not a capital gain.

■ Coming now to the nature of the $11,437.22 received by the taxpayer from Harmonic via Magnus under the settlement agreement of 1946: was it ordinary income, as held by the Tax Court, or capital gain, as contended by taxpayer?

The sum of taxpayer's contention is that the settlement proceeds constituted consideration for the transfer of his patent interests, just as the $18,638.76 payment did. We cannot subscribe to that contention. We think the Tax Court correctly held these proceeds to be ordinary income.

By the agreement of December 29, 1944, taxpayer purported to transfer his entire interest in the harmonica patents, including, by specific reference, the right to any sums recovered by International as a result of an infringement suit, whether by judgment or settlement. To the same effect are the provisions of the assignment of February 27, 1945 which plainly disclose that taxpayer retained no interest in the patents and that any claim for infringement then existing was transferred to International.

Taxpayer asserts that International, by agreements dated August 6, 1946, and September 5, 1946, recognized its obligation to pay royalties to taxpayer, but not Christensen, in the event it granted a license to third parties. The agreements lend no support to his argument. The first of these agreements was designed to clarify an ambiguity in the 1944 provision for royalties and specifically provided for the equal sharing of any royalties to be paid by certain Canadian interests then negotiating with International. The second agreement merely amplified the 1944 provision by which taxpayer and Christensen were each to get the specified royalty designated therein on all sales made by International. Contrary to taxpayer's contention, a reading of the critical agreements discloses that International was under no obligation to taxpayer to pay

over or otherwise account for sums received from its licensees.

This only remains to be said. The Tax Court did not answer the question whether taxpayer's right to the payments by Harmonic was bottomed on a personal right to the royalties paid under the terms of the settlement agreement or was a disguised dividend. In this connection the Commissioner points to the fact that taxpayer owned about seventy-five per cent of the outstanding stock at the time the agreement was incorporated in the decree of the District Court and argues that he was therefore able to direct the method and conditions of such payments. This control, coupled with the absolute relinquishment of any rights in the recovery in an infringe-ment suit by way of judgment or settlement and the absence of any obligation on the part of Magnus to pay over royalties received from its licenses, compels us to conclude that this payment constituted a disguised dividend rather than part of the consideration for the sale of patent interests.

In summary we are of the opinion that the Tax Court erred in holding the $18,-638.76 to be ordinary income and taxable as such, and that it correctly held the $11,437.22 to be ordinary income and taxable as such.

For the reasons stated the decision of the Tax Court will be reversed and the cause remanded with directions to proceed in accordance with this opinion.