**AMERICAN CHEMICAL PAINT COMPANY, Plaintiff,**

v.

**Francis R. SMITH, Individually and as Collector of Internal Revenue for the First District of Pennsylvania,**

and

**Walter J. ROTHENSIES, Individually and as Former Collector of Internal Revenue for said District, Defendants.**

**Civ. A. No. 12741.**

United States District Court
E. D. Pennsylvania.

April 22, 1955.

Logan Morris, John C. Noonan, of Nesbit, Morris, Pugh & Noonan, Philadelphia, Pa., for plaintiff.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Leland T. Atherton, Sp. Assts. to Atty. Gen., W. Wilson White, U. S. Atty., Philadelphia, Pa., for defendants.

LORD, District Judge.

This action was commenced by taxpayer for the recovery of $283,578.24,

plus interest, representing excess profits taxes alleged to have been overpaid for the taxable years 1940 through 1945. Most of the facts have been stipulated.

The Court, after examination of the pleadings and the stipulation of facts, and after considering the briefs and hearing argument thereon, makes the following

### Findings of Fact

The facts set out in the agreed stipulation of facts are incorporated herein and made a part hereof by reference. In addition to the facts so stipulated upon the record, as well as the testimony and evidence in this case, the Court makes the following additional findings of fact:

1. During the taxable years involved herein, plaintiff was and now is engaged in the manufacture and sale of chemical specialities to the metal working industry and to agriculture.

2. Many of the products and processes which plaintiff sells were developed in its research laboratories and, whenever practicable, such products and processes were patented.

3. The patents covered by the agreement of October 11, 1940, were obtained for the protection of plaintiff's products and processes, and not for sale.

4. During the taxable years involved herein, plaintiff was not engaged in the business of developing and selling patents, and it is not now so engaged.

5. The patents and applications for letters patent, covered by the agreement of October 11, 1940, were never offered for sale.

6. The patents, trade-marks, and trade-names, covered by the agreement of October 11, 1940, related to what is known as the zinc phosphate coating business. Such patents were adaptable to the coating of sheet metal parts used in the automobile industry, the refrigerator industry, and electrical appliances, and to other high production manufacturing operations.

7. After October 11, 1940, plaintiff discontinued the zinc phosphate coating branch of its business; and no discoveries or improvements in connection with the processes covered by the agreement were thereafter made or transferred to Parker Rust Proof Company.

8. Most of plaintiff's patents, including the spray granodine nitrite patent, described in the agreement of October 11, 1940, had been put to practical application several years prior thereto. The other patents described in the agreement were more or less related to the spray granodine nitrite patent. The patents described in the agreement which related to the hydrogen peroxide process had not been put to practical operation at least 18 months prior to October 11, 1940; and Parker Rust Proof Company did not use that process.

9. All of the patents covered by the agreement of October 11, 1940, had been put to practical use more than six months prior to the date of that agreement.

10. All of the patents described in the agreement dated October 11, 1940 had been used in plaintiff's business and were property of a character which was subject to the allowance for depreciation under the Internal Revenue law; but they were not property of a kind which would properly be includable in plaintiff's inventory if on hand at the close of any of the taxable years involved herein.

11. The trade-marks and trade-names included in the agreement of October 11, 1940 had been used by plaintiff in connection with its rust-proofing activities prior to 1936.

12. Plaintiff's reservations under the patents described in subparagraphs (2) and (3) of Article I of the 1940 agreement covered phosphate coatings that were applied by an ordinary spray gun or brush in the way ordinary paint is applied, known as "Kemick" and "Lithoform"; and plaintiff reserved the sole and exclusive right to use those trade-marks and trade-names. Plaintiff's do-

mestic gross sales in dollars of Lithoform and Kemick, reserved to plaintiff under that agreement, were as follows (Pltf. Ex. 5):

| Year | Lithoform | Kemick |
|------|-----------|--------|
| 1940* | $ 1,980 | $ 3,691 |
| 1941 | 8,815 | 15,185 |
| 1942 | 7,786 | 7,575 |
| 1943 | 14,968 | 7,655 |
| 1944 | 21,615 | 10,932 |
| 1945 | 12,938 | 9,225 |
| | $68,102 | $54,263 |

During the same period, plaintiff did not make any sales of Kemick in the Philippine Islands; and its sales of Lithoform there were small; they amounted to $352.87 in the year 1941.

13. The United States District Court for the Eastern District of Michigan, in the case of United States v. Parker-Rust-Proof Co., 61 F.Supp. 805, in 1945 held that the contract dated October 11, 1940, here involved was illegal and that Parker Rust Proof Company was not entitled to any of the benefits of that agreement. That Court also enjoined Parker Rust Proof Company from enforcing any of the rights secured under the patents covered by that agreement.

14. Plaintiff's claims for refund with respect to the taxable years 1940 and 1941 related only to excess profits tax, whereas its claims with respect to the taxable years 1942 to 1945, inclusive, related to normal tax income and excess profits tax net income and sought a refund of both income and excess profits taxes.

15. Plaintiff filed with the Commissioner of Internal Revenue on the dates shown below applications for special relief under Section 722 of the Internal Revenue Code of 1939, 26 U.S.C. § 722, in which applications it claimed refund of excess profits taxes for the taxable years in the amounts stated below:

| Date filed | Taxable Year | Excess Profits Tax Refund Claimed |
|------------|--------------|-----------------------------------|
| 9/14/43 | 1940 | $ 1,608.36 — (Deft. Ex. 7) |
| 9/14/43 | 1941 | 91,032.42 — (Deft. Ex. 8) |
| 9/14/43 | 1942 | 101,875.64 — (Deft. Ex. 9) |
| 3/13/47 | 1943 | 111,861.55 — (Dept. Ex. 10) |
| 3/13/47 | 1944 | 116,250.61 — (Deft. Ex. 11) |
| 3/11/49 | 1945 | 58,311.08 — (Deft. Ex. 12) |

In plaintiff's application with respect to the taxable year 1940, it requested refund of the amount of the excess profits tax as adjusted by the revenue agent's report covering that year. In plaintiff's applications with respect to the taxable years 1941 and 1942 it requested refund of the entire amounts of excess profits taxes shown on its excess profits tax returns for each of those years. In its applications with respect to the taxable years 1943 and 1944, plaintiff requested refund of amounts in excess of the excess profits taxes shown on its excess profits tax return for those years, less the amount of the renegotiation credit, and in excess of excess profits taxes recomputed by plaintiff after application of Section 722 of the Internal Revenue Code. In plaintiff's application with respect to the taxable year 1945, it requested refund of the excess profits tax as adjusted by the revenue agent's report covering that year over the amount of its excess profits tax as recomputed by plaintiff after application of Section 722 of the Internal Revenue Code.

16. As the result of plaintiff's applications for relief, pursuant to the provi-

* After October 11, 1940; three months.

sions of Section 722 of the Internal Revenue Code, and after its applications had been fully considered by the Commissioner of Internal Revenue, plaintiff, for the purpose of computing the excess profits credit, consented and agreed on July 10, 1950, to the Commissioner's determination of plaintiff's Constructive Average Base Period Net Income in accordance with the provisions of Section 722 of the Internal Revenue Code, and for excess profits tax taxable years and in the respective amounts as follows:

| Year | Constructive Average Base Period Net Income |
|------|------|
| 1940 | None |
| 1941 | $138,628.22 |
| 1942 | 138,628.22 |
| 1943 | 138,628.22 |
| 1944 | 138,628.22 |
| 1945 | None |

As the result of plaintiff's consent and agreement to the Commissioner's determination of its Constructive Average Base Period Net Income, the Commissioner recomputed plaintiff's income and excess profits tax liabilities for the taxable years 1941 through 1944, inclusive, and determined deficiencies in income tax and overassessments of excess profits tax for said years in the amounts, as follows:

| Year | Income tax Deficiency | Excess Profits Tax Overassessment |
|------|------|------|
| 1941 | $1,367.44 | $4,572.07 |
| 1942 | 2,426.93 | 5,624.27 |
| 1943 | 1,958.98 | 4,421.79 |
| 1944 | 879.90 | 1,886.61 |
| | $6,633.25 | $16,504.74 |

On February 10, 1951, plaintiff executed and on February 15, 1951, filed with the Internal Revenue Service a waiver Form 874 (Deft. Ex. 14) wherein, pursuant to the provisions of Section 272(d) of the Internal Revenue Code of 1939, 26 U.S.C. § 272(d), plaintiff waived the restrictions on assessment and collection of the deficiencies in income tax and accepted the overassessments of excess profits tax shown above.

The overassessments were credited against the deficiencies in income tax and interest shown above. The excess of the overassessments of excess profits tax over the deficiencies in income tax and interest thereon was refunded to the plaintiff; and there was also refunded to it the overpayment of $9.68 in declared value excess profits tax for the year 1941.

### Discussion

The principal question in this case is whether the agreement of October 11, 1940 constituted a sale or merely a license. If the agreement constituted a sale, then recovery for excess tax payments must be awarded to taxpayer. If the transaction involved a mere license, then recovery must be denied, since the payments would be considered as bona fide income tax levies under appropriate sections of the Internal Revenue Act.

During the taxable years involved herein, the taxpayer was engaged in the business of manufacturing and selling chemical paints. Prior to October 11, 1940, it had also been engaged in the zinc phosphate coating business which it discontinued after it entered into the licensing agreement, hereinafter described, with Parker Rust Proof Company on that date.

On October 11, 1940, the taxpayer entered into an agreement with the Parker Rust Proof Company in which the taxpayer is called the licensor and the Parker Rust Proof Company is called the licensee. Subject to certain rights specifically excepted and reserved under this agreement to itself, the taxpayer therein granted to Parker Rust Proof Company, the licensee, "the sole and exclusive right and license to make, have made, and sell products and to use and grant others the right to use processes" covered by certain United States and Canadian letters patent and by applications for United States and Canadian letters patent.

The patent reservations in the licensing agreement, which the taxpayer reserved to itself, and which the defendants believe demonstrate that this agreement was merely a license instead of an assignment, are contained in Article I of the agreement. By these reservations the taxpayer excepted from the license granted to the Parker Rust Proof Company and reserved to itself:

1. A non-exclusive right, limited to the Philippine Islands, to make, have made, and sell products and to use and grant others the right to use processes covered by the patents and patent applications described in Schedules A and B, and future inventions referred to in subsections (b) and (c) of Article I; and also a similar right to use the trademarks and trade-names listed on Schedule C of the agreement.

2. As to United States Patent No. 1,805,982 and corresponding Canadian Patent No. 305,575, certain specified uses and purposes; and taxpayer also reserved to itself the sole and exclusive right to use the trademark and trade-name "Kemick".

3. As to United States Patent No. 2,121,574 and corresponding Canadian Patent No. 389,413, certain specified uses and purposes. Also the taxpayer reserved to itself the sole and exclusive right to use the, trademark and trade-name "Lithoform".

4. As to the inventions, patents, or patent applications described in subsections (b) and (c) of Article I, the exclusive right to make, have made, and sell products and to use and grant to others the right to use processes covered by any of such patents in fields outside the general field of usefulness described in subsection (c).

5. As to the paints and painting processes covered by the inventions, patent applications and patents described in subsections (b) and (c), the exclusive right to manufacture, use and sell paints for use on hot rolled structural steel and plate, used for or to be used for the construction of ships, buildings, bridges, large storage tanks, large gas holders, fences, and the like, and for use in maintaining such structures, and to grant to others all of such rights.

6. The right to manufacture in the United States and Canada for sale and use only in countries other than the United States and Canada, materials covered by any of the inventions and discoveries and patent applications and patents included or to be included in the license agreement.

■ Reservations 5 and 6 of Article I are sufficient in themselves to negate the taxpayer's claim that the patents and inventions were *sold* to Parker Rust Proof Company. Under reservation 5 the licensee obtained only a right to manufacture, use, and sell *some species* of the patented inventions. By reservation 6, the patentee is not excluded from its right to manufacture the patented materials in the United States and Canada; this reservation imposed merely a limitation on that right in that the manufacture thereof must be restricted to materials intended for sale and use outside of the designated territory. Hence, the agreement did not convey to the licensee the entire and unqualified monopoly which the patentee had in the United States and Canada because the patentee retained the right to manufacture the inventions in this territory for use and sale outside it. It is therefore not a grant. Waterman v. MacKenzie, 1891, 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923.

■ The effect of the agreement between the taxpayer and Parker Rust Proof Company was to divide the manufacture of products under the taxpayer's patents between the taxpayer and Parker Rust Proof Company. The taxpayer continued to manufacture certain chemicals and processes under these patents and patent applications in accordance with the reservations it retained. Therefore, when the taxpayer split off the rights which it reserved for itself, Parker Rust Proof Company did not become the *owner* of the patents and patent

rights, but acquired only what limited and lesser rights were specifically granted by the terms of the agreement. Hence, the taxpayer did not convey, nor did it intend to convey the entire monopoly and property rights in its patents and patent applications.

Plaintiff contends that United States v. Carruthers, 9 Cir., 219 F.2d 21, 25, sustains its position that the agreement is clearly a sale. In that case, an exclusive "license" under a patent was granted which was limited to use in the tuna canning industry. The Court of Appeals held that such a transaction was a sale. However, that case is quite distinguishable from the present set of circumstances. In the Carruthers case, the Court pointed out that the testimony revealed that the patents had no established value for any purpose other than processing tuna fish. The Court explained that although in the agreement there were words of limitation " 'to the tuna industry' ", there was in fact a transfer of the *whole* patent rights, since the tuna industry included the full scope of the patents. In the instant case, the patent rights were not designed for use solely in any particular industry. Therefore, the reservations in the agreements constituted substantial limitations on their use, so that there was not a transfer of *whole* patent rights. Consequently, the agreement was a mere license. Waterman v. MacKenzie, supra. Having reached this conclusion, it would not appear to be necessary to discuss other questions raised in the case.

The facts as discussed herewith are incorporated in the Court's findings of fact.

### Conclusions of Law

Upon the foregoing facts, testimony and evidence adduced in this case, the Court concludes as a matter of law, as follows:

1. The agreement dated October 11, 1940, did not effect a sale of the patents, applications for patents, trade-marks and trade-names, and other property covered thereby. That agreement was a mere license to use the patents and trade-marks and trade-names.

2. Plaintiff retained an economic interest in the patents, applications for patents, trade-marks and trade-names, and other property covered by the agreement of October 11, 1940.

3. The reservations which plaintiff made to itself in the agreement of October 11, 1940, did not constitute a license back to it of the interests so reserved.

4. The amounts which plaintiff received under the agreement of October 11, 1940, from Parker Rust Proof Company in each of the taxable years here involved were royalties taxable as ordinary income in each of the said years, and as such were not excludable from plaintiff's excess profits tax net income for said years.

5. Plaintiff is not entitled to recover any amount in this proceeding.

6. Defendants are entitled to judgment dismissing plaintiff's complaint, together with their costs.

7. Entry of judgment in conformity with the foregoing findings of fact and conclusions of law is hereby directed.