Richard R. LAWRENCE and wife, Dorothy Lawrence, Appellants,

v.

UNITED STATES of America, Appellee.

No. 16122.

United States Court of Appeals Fifth Circuit.

March 21, 1957.

Lawrence P. Gwin, Bay City, Tex., Howell Cobb, Beaumont, Tex., Erwin G. Ernst, Houston, Tex., of counsel, for appellants.

Davis W. Morton, Jr., Grant W. Wiprud, Hilbert P. Zarky, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., William M. Steger, U. S. Atty., John L. Burke, Jr., Asst. U. S. Atty., Tyler, Tex., for appellee.

Before RIVES, TUTTLE and JONES, Circuit Judges.

RIVES, Circuit Judge.

The question for decision is whether the district court erred in entering judg-

ment n.o.v. on the ground that, as a matter of law, under Section 117(a) and (q) of the Internal Revenue Code of 1939 as amended,[1] royalties received by the taxpayer Lawrence as licensor of patent rights constituted ordinary income rather than capital gain.

Taxpayer Lawrence is the inventor of a device designed for the purpose of removing pipe and other obstructions from oil wells, known as a pulling or fishing tool.[2] On November 18, 1946, he entered into an agreement with Dailey Oil Tools, a corporation, whereby he granted to Dailey the sole and exclusive right throughout the United States to manufacture, use and lease to others for use said invention and all improvements thereon. Dailey agreed to pay royalties on its use of the device and on the gross amount received by it from the lease of the tool to others. The agreement also provided for minimum guarantees of amounts of royalties to Lawrence; that Lawrence had the right to cancel the agreement upon failure of Dailey to perform its obligations thereunder; that the parties would divide the expenses or profits from any litigation concerning

patent infringement; that Dailey had the right to cancel the contract at any time by giving Lawrence thirty-days written notice of its intention to do so; and that further improvements in the invention thereafter made by Lawrence would "be included within the terms of this license contract as though fully set forth and described herein."

Thereafter, Lawrence completed an improvement on his device.[3] A supplemental agreement was executed between the parties on February 9, 1951 whereby it was agreed that Lawrence was to receive fifty per cent of the net profits received by Dailey for any sales of the products of the patents in export trade.

Lawrence and his wife filed income tax returns for the years 1951, 1952 and 1953 in which they treated the royalty payments received from Dailey as ordinary income, and on the 6th day of May, 1954 filed with the Director of Internal Revenue claims for a refund in which they asserted that the returns for the years in question should have been made on the basis that the royalties were long-term capital gains instead of ordinary income. The Commissioner refused the

---

1. Internal Revenue Code of 1939:

"§ 117. *Capital gains and losses.*
"(a) *Definitions.* As used in this chapter—
"(1) *Capital assets.* The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business) * * *
* * * * * *
"(4) [As amended by § 150(a) (1) of the Revenue Act of 1942, c. 619, 56 Stat. 798, and § 322(c) (2) of the Revenue Act of 1951, c. 521, 65 Stat. 452] *Long-term capital gain.* The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income:
* * * * * * *
"(q) [As added by § 1 of the Act of June 29, 1956, c. 464, 70 Stat. 404] *Transfer of patent rights.*—
"(1) *General rule.*—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be

considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—
"(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or
"(B) contingent on the productivity, use, or disposition of the property transferred.
* * * * * * *
"(4) *Applicability.*—This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred." 26 U.S.C.A. § 117.

2. His original patent was the subject of litigation in Hunt Tool Co. v. Lawrence, 5 Cir., 242 F.2d 347.

3. Lawrence was issued United States Letters Patent No. 2,377,249 on May 29, 1945, and No. 2,537,413 on January 9, 1951.

refund and on December 2, 1954, Lawrence filed an action in the district court under authority of Title 28 U.S.C.A. § 1346(a) (1).

The court instructed the jury inter alia,

"I instruct you that it is the law that before there can be a sale of a patent the person selling it, the vendor, must transfer to the vendee the sole and exclusive right to make, use and sell the patent, provided under the evidence the right to sell is a substantial right, under the evidence and circumstances here.

&ast; &ast; &ast; &ast; &ast; &ast;

"Now, in determining whether or not Lawrence retained a substantial interest in the invention after he executed this contract of 1946 and the supplement in 1951, you may take into consideration all the facts and circumstances in evidence here, the nature of the device covered by the patent, and all of the circumstances relating to its use.

&ast; &ast; &ast; &ast; &ast; &ast;

"If you find from a preponderance of the evidence that under this contract he did not retain a substantial interest in this invention, then the form of your verdict shall be 'we, the jury, find in favor of the plaintiffs'."

The jury brought in a verdict for the plaintiffs, but the district court entered judgment non obstante veredicto on the ground the transfer was not "of all substantial rights to a patent," since it did not include the right to sell.

Our primary consideration is to determine whether the failure to transfer the right to sell precludes the agreement from being a transfer of all substantial rights to the patent. The jury found that all substantial rights were transferred and we think that reasonable men could so find.

In its oral argument, counsel for the Commissioner urged on this Court the rule laid down in Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923, that, unless the patentee conveyed the exclusive right to make, use and sell the patented product, then the transaction was a mere license; but we adopt Parke, Davis & Co. v. Commissioner, 31 B.T.A. 427, in so far as it distinguishes the Waterman case, supra. The question in the Waterman case concerned who had sufficient title to maintain a suit for infringement, while the question involved in this case is what rights to the patent are substantial.

The evidence before the jury in this case indicates that the tools made from this Lawrence patent are classified in the trade as service tools and that service tools are not for sale. The evidence also shows that Dailey wanted complete control of the tools. Mr. Lawrence testified:

"A. &ast; &ast; &ast; he [Dailey] wanted full control of the patent to where he could control the manufacturing and operation and complete control of the tool and we eventually agreed on that terms, and after we did agree to it

&ast; &ast; &ast;

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Just answer the question, Mr. Lawrence. A. The agreement between Mr. Dailey, with the Dailey Oil Tool Company and myself, that he would have the exclusive sale, exclusive rights, and full control to manufacture, to lease to others, and to operate, and every purpose that would be in it of any benefit to the company except the sale of the tools, he didn't want to sell no tools at all, and we agreed between us that there wouldn't be no tools sold, not in the United States, and that was for the purpose of protecting not only the Dailey Oil Tool Company but it was a protection for my own self, not to sell tools. And the reasons for that is, it would be several reasons, first, that it takes a well-trained experienced operator to operate this tool. Just anybody that hasn't had the proper training can't go out and operate this tool successfully. And if anyone would buy a tool and go out to operate it and start to having fail-

ures or damaging holes with it, it would hurt the name of the hydraulic pulling tool, and in that event it would hurt the Dailey Oil Tool Company's business, and it would affect my income from the tool.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Mr. Lawrence, state whether or not it was a matter of importance to you and Mr. Dailey at the time that you negotiated this agreement that neither of you have the right to sell the hydraulic pulling tool? A. Yes, sir, that was very important to both of us, not to sell the tool.

"Q. And was that for the reasons that you have just stated? A. That's correct, yes, sir.

"Q. Did you regard the right to sell the tool at that time as being a valuable thing, Mr. Lawrence? A. No, sir, I regarded the sale of the tool at that time, that it would be, if it was sold to the public for any such use as that, would be an injury to the Dailey Oil Tool Company as well as being an injury to myself."

Thus, we have both Lawrence and Dailey solicitous over protecting the reputation of the tool, Lawrence protecting his interest in the payment he was to receive, Dailey protecting the beneficial interest in the patent which it was acquiring. Neither considered the sale of the tool advisable or the right to sell a substantial right. What is "substantial" often becomes a factual question to be decided according to the facts and circumstances of each case and the peculiarities inherent in each patent.[4]

Appellant makes the further objection that the agreement could be terminated on the part of the licensee by giving thirty-days notice with or without cause, and on the part of the licensor by giving sixty-days notice upon default by the licensee. This Court held, however, in Allen v. Werner, 5 Cir., 190 F.2d 840, that the existence in the grantee of a right of cancellation does not preclude the idea of a sale, and that the possibility of termination by a licensor upon default of the licensee was a condition subsequent which did not negate the sale of the invention.

The judgment of the district court is reversed and the cause remanded with directions to enter judgment upon the jury's verdict.

Reversed and Remanded with Directions.

---

4. Allen v. Werner, 5 Cir., 190 F.2d 840, 842; Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, 64.

The Senate Committee Report on the Internal Revenue Code of 1954 recognized this in discussing the purpose of Section 1235, dealing with patents, by saying:

"&ast; &ast; &ast; Moreover the Courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to 'use' the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones. &ast; &ast; &ast;" 3 U. S.Congressional & Administrative News, 1954, p. 5083.