Russell T. WING and Zoe E. Wing,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 16397.

United States Court of Appeals
Eighth Circuit.

June 2, 1960.

Hayner N. Larson, Minneapolis, Minn., for petitioners.

Joseph Kovner, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before GARDNER, WOODROUGH, and VOGEL, Circuit Judges.

GARDNER, Circuit Judge.

Petitioner, referred to in the record as Wing, seeks a review of the decision of the Tax Court determining deficiencies in his income taxes for the years 1951, 1952 and 1953.

The facts are not in dispute and so far as here pertinent are substantially as follows. Petitioner invented a feed for fountain pens for which he filed an application for a patent in 1937, on which application patent issued in 1940. On January 24, 1938, he entered into a written agreement with the Parker Pen Company covering all existing inventions, in the agreement called "present inventions", and all future inventions, called "improvements", together with all patents obtained thereon, "made or otherwise acquired" by petitioner relating to such feeds. United States patents on

three such improvements invented by petitioner were issued to him in 1942, 1944 and 1947. Petitioner's agreement with Parker is very voluminous. So far as here pertinent, it in effect grants to Parker a sole "option to acquire exclusive rights and license to manufacture, use and sell fountain pens embodying said present inventions and said improvements upon the terms and under the conditions and provisions" set forth in the agreement. Parker exercised the option. The contract further granted to Parker "the exclusive right and license to make or cause to be made, to use, and to sell or cause to be sold, throughout the world, fountain pens embodying said present inventions and said improvements, under and for the life of any Letters Patent or applications for Letters Patent therefor, unless sooner terminated under the provisions hereof." For this "right and license", which Parker was "authorized" to exercise not only itself but also through "any other Company or agency * * * that is controlled by or affiliated with Parker", Parker was required to pay Wing "a royalty on each fountain pen sold by or for Parker embodying any said present invention or any said improvement" equal to a stated percentage of the sale price of each such pen, with a total annual minimum of $5,000.00 for the first license year and $8,000.00 for each succeeding license year.

Parker was by the agreement given an unqualified "right to cancel this license" on 90 days written notice. Wing too was given a "right to cancel" on like notice, but he could do so only "for any breach or default thereof by Parker" specified in such notice and not "made good" within the 90 days. Further, the agreement gave to Parker alone the right, in its own name or in Wing's name, or in both, to sue infringers and "to make settlement" with them. Wing was given only "the right to be represented, at his own separate expense, in such proceedings by advisory counsel", and he was excluded from participation in any recovery.

On February 26, 1943, Parker and Wing entered into a written agreement with W. A. Sheaffer Pen Company. The agreement recited, among other things, that Parker and Wing were joint plaintiffs in a suit pending against Sheaffer for infringement of several patents, including the two Wing patents as to which letters had already issued, and that "the parties are desirous of settling said suit." It then went on to provide that "Wing and Parker agree", simultaneously with execution of this agreement, to modify their agreement of January 24, 1938, "to an extent sufficient to enable Parker to grant Sheaffer a limited license under said Wing patents * * * and permit Wing to receive royalties from Sheaffer, all as hereinafter set forth." It then stated, among other things, that "Parker hereby grants unto Sheaffer," subject to conditions specified, "the non-exclusive right and license to make or cause to be made, to use, and sell or cause to be sold, throughout the world, Fountain Pens under certain (specified) claims of said Wing patents"; that Sheaffer "acknowledges (the) validity of said specified claims"; that Sheaffer would pay Parker $25,000.00 as "a part of the consideration of the license rights (including those to the Wing patents) acquired by Sheaffer from Parker hereunder"; and that as "part of the consideration of the license hereby granted to Sheaffer under said Wing patents * * * with the consent and cooperation of Wing, Sheaffer shall pay to Wing" the same percentage "royalty on each Fountain Pen sold by or for Sheaffer" as was payable by Parker to Wing, with an annual minimum total payment of $6,000.00. Wing and Parker together waived all their rights "for any past infringement" of the Wing patents, and agreed to cut Sheaffer's "royalty" to any lower figure granted others. Sheaffer was given an unqualified right similar to Parker's "to cancel its license" by giving written notice, and while Wing was also given a "right to cancel" upon like notice, again it was only for "breach or default" not "made good" within the no-

tice period; any such notice by either to the other had to run also to Parker.

Conformably to the promise made in the agreement with Sheaffer, Wing and Parker on the same day, February 26, 1943, executed a short so-called "rider" to their agreement of January 24, 1938, whereby they agreed "to modify" it "to an extent necessary to enable Wing and Parker to enter into said agreement with Sheaffer," and also to reduce Parker's "yearly minimum royalty" to Wing from $8,000.00 to $6,000.00 so long as the "Sheaffer license" should remain in effect.

Two years later, March 2, 1945, Parker, Wing, and Sheaffer joined with W. A. Sheaffer Pen Company of Canada, Ltd., in executing an agreement which was called a "rider and supplement" to their agreement of February 26, 1943. Therein it was provided that all Sheaffer's rights "to manufacture, use or sell fountain pens in the Dominion of Canada, Newfoundland, the British Isles (including the Irish Free State), Australia and New Zealand under said Parker-Wing-Sheaffer agreement shall be and are hereby vested in Sheaffer of Canada", which agreed to bring itself, to the extent of their applicability to these areas, under the terms of that agreement, except that Sheaffer of Canada was subjected to no "annual minimum royalty" and its "earned royalties" were to be added to Sheaffer's in computing the amount, if any, payable by the latter annually in excess of its $6,000.00 minimum. The "rider" provided further that so long as "the major stock ownership and management of Sheaffer of Canada" should remain unchanged and Sheaffer's "license" should remain in force, Sheaffer would guarantee payment to Wing of the "earned royalties" of both companies in excess of Sheaffer's annual minimum, and also that termination of Sheaffer's "license" would automatically terminate that of Sheaffer of Canada.

Wing and Parker under date of January 1, 1947, entered into a written agreement with L. E. Waterman Company. This agreement recited that Parker, with Wing's consent, had charged Waterman, also a pen manufacturer, with infringement of two of the Wing patents theretofore issued, that the parties were desirous of avoiding litigation, and that "to that end Parker is willing to grant and Waterman is willing to accept a license under said Wing Patents." It then went on to provide, among other things, much the same as in the February 26, 1943, agreement with Sheaffer, that Wing and Parker would modify their contract of January 24, 1938 "to an extent sufficient to enable Parker to grant Waterman a limited license * * * and to permit Wing to receive royalties" from Waterman; that "Parker hereby grants unto Waterman * * * a non-exclusive right and license" under the two patents in question to make, use, and sell pens of a specified design and structure; that Waterman would pay to Wing the same percentage as Parker and Sheaffer of the selling price of each such pen sold, with a minimum annual total payment of $6,000.00; and that the rights of the parties would be subject to cancellation on substantially the same terms as in the Sheaffer agreement—by Waterman without qualification, and by Wing for any uncured breach or default. Waterman's rights under the agreement, like those of Sheaffer under its agreement, were made non-assignable except in connection with transfer of its entire business, but Waterman was authorized to grant a "sublicense" to any of "its foreign manufacturing agents or foreign manufacturing subsidiaries" upon payment of the same "earned royalty", such payment being guaranteed by Waterman.

No agreements other than the foregoing have been made by Wing with respect to his inventions of fountain pen feeds. Under these agreements he received taxable income as follows: $74,742.26 for 1951, $40,681.52 for 1952, and $71,426.80 for 1953. In the notice of deficiencies the Commissioner treated the payments for all three years as ordinary income. On petition to the Tax Court for a redetermination of the deficiencies determined by the Commis-

sioner the court held that the payments constituted ordinary income, not long-term capital gain, and accordingly entered its decision which petitioner now seeks to review.

In seeking reversal petitioner contends that the transfer to Parker of his inventions was a "sale or exchange" within Section 117(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a), and that it was a transfer of "all substantial rights" in his patents within Section 117(q) of the Internal Revenue Code of 1939. If Wing transferred all his substantial rights in his patents to Parker, then whatever compensation he received because of such transfer was taxable under Section 117(q) of the Internal Revenue Code of 1939 as capital gain. This is conceded by respondent but it is claimed that the contract here involved did not have the effect of transferring all of Wing's substantial rights because of the acts of the parties to the contract subsequent to its original execution. The contract granted to Parker "the exclusive right and license" throughout the world to make, use, and sell fountain pens embodying his inventions in the field of fountain pen feeds for the life of any patents issued therefor. This we think transferred to Parker all substantial rights which Wing had in his patents. Watson v. United States, 10 Cir., 222 F.2d 689; Rollman v. Commissioner, 4 Cir., 244 F.2d 634; Storm v. United States, 5 Cir., 243 F.2d 708; Lawrence v. United States, 5 Cir., 242 F.2d 542. In Watson v. United States, supra, the court considered a contract, designated a license, very similar in its provisions to the contract in the instant case and the opinion answers practically every contention urged by the Commissioner in the instant case. In the course of that opinion it is said, inter alia [222 F.2d 690.]:

"It is a firmly accepted principle of law that if the patentee conveys by an instrument in writing the exclusive right to make, use, and vend the invention throughout the United States, or an undivided part or share of that exclusive right, or the exclusive right under the patent within a specified area within the United States, the conveyance constitutes an assignment of the patent, complete or partial as the case may be; and that a transfer short of that is not an assignment but a license. (Citing cases.) * * * The agreement between Watson and O'Donnell was entitled License Agreement, and in it the parties were referred to as licensor and licensee, respectively. But nomenclature of that kind has little if any significance in resolving the question whether the instrument amounted to an assignment or was a license. The calling of the instrument a license agreement, and the denomination of the parties thereto as licensor and licensee, respectively, did not fix, limit, or qualify the scope and effect of the grant. The legal question whether the instrument constituted an effective assignment or was a license must be determined by considering together the several provisions contained in the instrument, not its title or the manner in which reference was made to the parties. (Citing cases.)

"The agreement contained a provision relating to the termination of its exclusive character. * * * But that provision concerned itself exclusively with a condition subsequent. It did no more than provide that upon the occurrence of a stated event the grantor was empowered to terminate the exclusive right and title theretofore conveyed. It did not detract from the effectiveness of the agreement as constituting an assignment of the patent rights. (Citing cases.)

"The contract contained a further provision that the rights of the licensee thereunder should not be assigned without the consent of the licensor having been obtained in writing. That precautionary provision was intended to protect the rights of

the parties under the contract, not to proscribe, limit, or nullify their intent and purpose to vest immediately in the transferee the right to manufacture, sell, and use the carts throughout the life of the patent, as well as any extension or extensions thereof. (Citing cases.)

"The agreement contained a provision for payment of royalties. That provision merely fixed the compensation to be paid as consideration for the transfer. It did not reserve to Watson any control over the patent or its use. It did not limit or qualify the scope of the grant. And since the agreement contained language vesting in the corporation the exclusive right to manufacture, sell, and use carts throughout the United States, the provision for payment of royalties did not change the nature of the transfer to a license. (Citing cases.) * * *

"The contract between Watson and O'Donnell constituted an assignment to the corporation of the invention relating to the collapsible carts. Such assignment amounted to a sale of a capital asset. * *."

Clearly there was an assignment of every substantial right Wing had in this patent. Having assigned the exclusive right to make, use and sell throughout the world Wing's patented inventions, it is difficult to believe that there remained in him any substantial right, and all payments received by him whether designated as royalties or otherwise were compensation for this absolute assignment.

The contention of petitioner is strongly supported by the legislative history. Thus, the Committee of the Senate in recommending the passage of the legislation in its Report said in part:

"Under present law, an express assignment of patent rights by the owner, or an exclusive license of the right to manufacture, use, and sell, the invention thereunder for the life of the patent, can qualify as a

'sale or exchange' for tax purposes; thus, the holder can obtain capital gains treatment on such a transfer if he falls within the 'amateur' category. Many court decisions have arrived at this result, not only where the manner of payment has been a lump sum, but also where the purchase price has been conditioned on the use or profitability of the invention, i. e., where it takes the form of 'royalty' payments. * * * (Citing cases.) * * * However, in 1950 the prospect of continued litigation was engendered in this area by the issuance of Mimeograph 6490 (1950–1 CB 9), in which the Commissioner of Internal Revenue announced that he would thereafter regard such assignments or licenses as 'providing for the payment of royalties taxable as ordinary income' if payment is measured by the production, sale, or use of the property transferred or if it is payable periodically over a period generally coterminous with the transferee's use of the patent. To obviate the uncertainty caused by this mimeograph and to provide an incentive to inventors to contribute to the welfare of the Nation, your committee intends, in subsection (a), to give statutory assurance to certain patent holders that the sale of a patent (whether as an 'assignment' or 'exclusive license') shall not be deemed not to constitute a 'sale or exchange' for tax purposes solely on account of the mode of payment.

"The section does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent (other than the right to such periodic or contingent payments) should be transferred to the transferee for consideration. This requirement recognizes the basic criteria of a 'sale or exchange' under existing law, with the exception noted relating to contingent pay-

ments, which exception is justified in the patent area for 'holders' as herein defined. To illustrate, exclusive licenses to manufacture, use, and sell for the life of the patent, are considered to be 'sales or exchanges' because, in substantive effect, all 'right, title, and interest' in the patent property is transferred (irrespective of the location of legal title or other formalities of language contained in the license agreement). * * * Furthermore, retention by the transferor of rights in the property which are not of the nature of rights evidenced by the patent and which are not inconsistent with the passage of ownership, such as a security interest (e. g., a vendor's lien) or a reservation in the nature of a condition subsequent (e. g., a forfeiture on account of nonperformance) are not to be considered as such a retention as will defeat the applicability of this section." S. Rep. No. 1622, 83d Cong., 2d Sess., pp. 439–440.

The legislation was manifestly in the nature of a relief measure and should be liberally construed. Young v. Commissioner, 2 Cir., 269 F.2d 89.

It seems to be the contention of the Commissioner that subsequent acts of the parties in granting limited license agreements to various parties had the effect of transforming the assignment from Wing to Parker into a license. By no subsequent act was there reinvested in Wing any substantial right in the patents and Wing's joining with Parker in these sublicenses, whether required by the sublicensee or by Parker, was not inconsistent with his contract assigning all substantial rights in his patents to Parker. The payment of royalties, as pointed out in Watson v. United States, supra, was a part of the compensation received by Wing for assigning all his substantial rights in the patents to Parker.

The petition for review is therefore granted and the decision of the Tax Court is reversed and the cause is remanded with directions to enter judgment for petitioner consistent with this opinion.