**John H. KIRBY II and Haysel Kirby, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 12304.

United States District Court
S. D. Texas,
Houston Division.

Dec. 12, 1960.

Motions to Set Aside Judgment, for New Trial and to Take Additional Testimony Denied March 23, 1961.

Cooper K. Ragan and John L. Russell, Houston, Tex., for plaintiffs.

Abbott M. Sellers, Acting Asst. Atty. Gen., Lyle M. Turner, Myron C. Baum, and Robert L. Littenberg, Attys., Dept. of Justice, Washington, D. C., William

B. Butler, U. S. Atty., and John Henry Baumgarten, Asst. U. S. Atty., Houston, Tex., for defendant.

INGRAHAM, District Judge.

This is an action for recovery of income taxes for the year 1953 amounting to $4,977.87, plus statutory interest, and for the year 1954 amounting to $8,502.87, plus statutory interest. Haysel Kirby is a party to this suit by virtue of the fact that she was the wife of plaintiff, John H. Kirby II, and filed a joint return with him in 1953 and 1954. The evidence was garnered and the case heard through stipulations, answers to interrogatories, requests for admissions, and undisputed testimony. The parties have submitted thorough briefs.

Plaintiff Kirby was issued a patent on a magnetic fishing tool device in 1951. This device is used to recover metallic fragments from oil wells. On May 9, 1952, he entered into an agreement with K & G Oil Tool & Service Co., Inc. (hereinafter K & G), concerning this patent and tool. The agreement (plaintiff's Exhibit 4) reads in part:

"Licensor hereby grants and conveys to Licensee the sole and exclusive right to manufacture, lease and let throughout the United States and the Dominion of Canada, * * * the Magnetic Fishing Tool or improvements thereto * * *"

Licensor, plaintiff Kirby, was to be paid by licensee, K & G, a percentage of gross rentals as defined by the agreement. Licensee could not sell but was to rent or lease the equipment. Licensee was given the right to sue for infringement at its own expense and for its own account. The contract is to continue in force for the life of the main patent with an option in licensee to extend at the end of the term if there are patents then in existence, such as patents on improvements in the tool, and plaintiff has been issued additional patents covering improvements in the fishing tool.

Thus it is seen that by the terms of the contract licensee had the exclusive right to manufacture, lease, and let the tool within the United States and Canada. Licensee was not granted the right to "use" the tool in so many words, but a grant of such right is implicit in the agreement. K & G is a service company, owns no wells or drilling equipment as such, and consequently did not desire to "use" the equipment other than in providing its service to drillers and others who might need it. Licensee had, by the terms of the contract, no right to sell the equipment. Licensor, taxpayer, had the right to sell the device outside the United States and Canada. It might be well to observe here that it is customary in the industry to lease or rent these service tools, usually with operators. The reason for renting rather than selling being that it is more practicable and profitable for all parties concerned for a service company such as K & G to own and operate than for drillers to attempt to own, operate, and maintain a complete set of the tools.

Licensor, taxpayer, had a number of these devices manufactured in the United States, not by K & G, and sold them outside the United States and Canada, with all of the sales but one being consummated in the United States (Tr. 38–39, 41). The evidence shows that the taxpayer's income from the foreign sales almost equaled his royalty payments in 1955 and exceeded the royalties in 1956, 1957, and 1958.[1] Under the contract,

1. For the years 1955, 1956, 1957 and 1958 the comparison is as follows (defendant's exhibits 1, 2, 3, 6, 7, 8, 9):

| Year | Royalties from K & G | Net Profit From Foreign Sales |
|------|------|------|
| 1955 | $20,775.63 | $17,680.75 |
| 1956 | 24,856.49 | 29,297.04 |
| 1957 | 28,137.94 | 38,821.35 |
| 1958 | 10,940.06 | 35,573.27 |

taxpayer was paid by K & G in 1953 the sum of $16,587.15 and in 1954 the sum of $26,429.78, which was the royalty equivalent to 5% of the gross rental of the tools for each of these years.

Taxpayers duly filed their joint return for 1953 and reported the royalty of $16,587.15 as ordinary income, and income taxes were paid on that basis. After the 1954 Internal Revenue Act clarified the tax treatment of patent royalties, taxpayers timely filed claim for refund of $4,977.87 with interest, contending that the amount of $16,587.15 represented consideration for the sale of his patent and that such amount was long term capital gain rather than ordinary income.

Taxpayers duly filed their joint return for 1954 and reported the royalty received of $26,429.78 and calculated and paid the tax on a capital gains basis. The Commissioner of Internal Revenue found and assessed a deficiency in tax of $8,502.87 which taxpayers paid. Taxpayers timely filed a claim for refund of $8,502.87, with interest, contending that the amount of $26,429.78 represented consideration for the sale of his patent and that such sum was a long term capital gain, not ordinary income. Plaintiffs sue here after exhaustion of administrative remedies.

The pertinent statutory provision is Internal Revenue Code of 1939:

"Sec. 117(q) (As added by Sec. 1 of the Act of June 29, 1956, c. 464, 70 Stat. 404) *Transfer of patent rights.*

"(1) *General rule.*—A transfer (other than by gift, inheritance, or

devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(B) contingent on the productivity, use, or disposition of the property transferred." 26 U.S.C.A. § 117(q).[2]

Internal Revenue Code of 1939, Sec. 117 (q), *supra,* governs the year 1953. Internal Revenue Code of 1954, Sec. 1235, 26 U.S.C.A. § 1235, governs 1954 but is not reproduced here, because it is essentially the same as Internal Revenue Code of 1939, Sec. 117(q).

Treas. Reg. Sec. 1.1235–2 (1954 Code) provides:

"(b) *All substantial rights to a patent.* (1) The term 'all substantial rights to a patent' means all rights which are of value at the time the rights to the patent (or an undivided interest therein) are transferred. The circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer, shall be considered in determining whether or not all substantial rights to a patent are transferred in a transaction. * * * "[3]

---

**2.** Summary of Int.Rev.Code of 1939, Sec. 117(q). In order to obtain capital gains treatment under this section it is provided that a transfer of a patent shall be considered a sale or exchange of a capital asset held for more than six months where the following conditions are met:

(a) transfer is made other than by gift, inheritance, or devise;

(b) *transfer is of all substantial rights to patent or invention,* or undivided interest therein;

(c) transfer is made by taxpayer who qualifies as "holder";

(d) it is immaterial that consideration for transfer consists of payments made periodically during period of transferee's use of patent or which are contingent on productivity, use, or disposition of transferred interests. It is undisputed that taxpayer meets requirements "a", "c" and "d". The dispute herein is over "b".

**3.** Pertinent legislative history is found in the Senate Committee Report on the In-

The position of taxpayer, as I conceive it, is that the licensee was granted exclusive right to manufacture, lease, let, and use the tool. That the only right not granted to licensee was the right to sell the tool in the United States or Canada. The court is told that the right to sell this particular tool is not a "substantial" right under the statutes or the authorities hereinafter cited and discussed. That even though K & G was not granted the right to sell, in fact was prohibited from selling in the United States and Canada, taxpayer did not retain any right to sell machines manufactured in the United States because he had no right to manufacture them in the United States or Canada. Plaintiff says that taxpayer did not "retain" any right to manufacture and sell abroad because such right was open to all. Finally, it is taxpayer's position that I cannot look to acts transpiring in 1955 and subsequently because the contract is, they say, unambiguous in its terms.

On the other hand, the position of the government seems to be, the contract as it may, that taxpayer did manufacture or have manufactured in the United States some of these tools, that he did sell them abroad, that most of the sales were consummated in the United States, and that he did profit more by them than he did by the contract with K & G in 1956 and subsequent years. The government's position, simply stated, is that they are unable to see how rights which are demonstrably so valuable monetarily can be said to be other than "substantial".

■ The issue is whether taxpayer transferred "all substantial rights" (Int. Rev.Code of 1939, Sec. 117(q); Int.Rev. Code of 1954, Sec. 1235) in this patent or these patents so as to qualify under these statutes for capital gains treatment.

At the outset Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923, must be eliminated from consideration. It did not involve interpretation of tax statutes. Rather, Waterman dealt with the infringement of patent rights and declared a test for determination of whether a patent had been licensed or assigned for suit purposes. Many cases have found Waterman inapposite in the present circumstances.[4] Our own court of appeals did so in Bannister v. United States, 5 Cir., 1958, 262 F.2d 175, 177.

Taxpayer places considerable reliance on Lawrence v. United States, 5 Cir., 1957, 242 F.2d 542, a case much like the

ternal Revenue Code of 1954 which discusses the purpose of Section 1235, which is likewise applicable to Section 117(q) of the 1939 Code. Quoting from S.Rep. No. 1622, 83d Cong., 2d Sess. 439-440 (1954):

"The section does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent * * * should be transferred to the transferee for consideration. This requirement recognizes the basic criteria of a 'sale or exchange' under existing law, with the exception noted relating to contingent payments, * * * To illustrate, exclusive licenses to manufacture, use, and sell for the life of the patent, are considered to be 'sales or exchanges' because, in substantive effect, all 'right, title, and interest' in the patent property is transferred (irrespective of the location of legal title or other formalities of language contained in the license agreement). Moreover, the courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to 'use' the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones."

4. The inapplicability of Waterman to tax questions was first recognized in Parke, Davis & Co. v. Commissioner, 1934, 31 B.T.A. 427. Other cases refusing to follow Waterman are Lawrence v. United States, 5 Cir., 1957, 242 F.2d 542, 544, and Rollman v. Commissioner, 4 Cir., 1957, 244 F.2d 634, 637.

one under consideration but with important differences. The case was not reported in the district court, but apparently there were no foreign sales by the licensor such as we have here.[5] The only right retained by the licensor in Lawrence was the right to sell the invention in the United States. Accordingly, the only question raised was whether the retention of that right was the retention of a substantial right. All that Lawrence held was that it could not be said as a matter of law that the failure of the licensor to grant to the licensee the right to sell the device involved there in the United States amounted to a failure of the licensor to transfer "all substantial rights" to the licensee. Lawrence also said that "what is 'substantial' often becomes a factual question to be decided according to the facts and circumstances of each case and the peculiarities inherent in each patent." 242 F.2d 542, at page 545. The substantiality of the right to manufacture for foreign sales was not determined there, nor was the right to make foreign sales treated.

I think that plaintiff might agree that had he retained the right, on the face of the contract, to manufacture this tool in the United States for sale abroad that this retention would be the retention of a "substantial right" in the patent, thus disqualifying him for capital gains treatment.[6] But plaintiff insists that I cannot look at the actual manufacture here, for sale abroad, to get at the meaning of an unambiguous contract entered into long before. Plaintiff cites a number of authorities to the effect that subsequent events are not competent to determine whether taxpayer retained any substantial rights under his contract of May 1952. Plaintiff misconceives the relevance of the manufacture here with sales abroad. I consider these sales abroad solely to arrive at whether the rights retained by licensor-taxpayer are "substantial rights" within the meaning of Internal Revenue Code of 1939, Sec. 117 (q), and Internal Revenue Code of 1954, Sec. 1235. I think they are. As pointed out above the terms of the contract seem to preclude the manufacture of the tools in this country by the taxpayer, and plaintiff says the contract is unambiguous. But surely plaintiff would not insist that taxpayer might have manufactured and sold the tools in the United States under this contract and then said to the government that he should get capital gain treatment on the royalties from K & G because the contract said he could not manufacture and sell the tools in the United States. The court is not varying the terms of the contract, but is simply looking at what taxpayer actu-

5. The following passage in 242 F.2d 542, 543 indicates that, unlike the present case, the right to sell in foreign markets passed to the licensee:

"A supplemental agreement was executed between the parties on February 9, 1951, whereby it was agreed that Lawrence (licensor) was to receive fifty per cent of the net profits received by Dailey (licensee) for any sales of the products of the patents in export trade."

6. Although involving excess profits taxes prior to the statutory enactments of 1954 and 1956, American Chemical Paint Co. v. Smith, D.C.E.D.Pa.1955, 131 F. Supp. 734 is somewhat in point. The agreement there provided for retention by licensor in 131 F.Supp. at page 738 of:

"The right to manufacture in the United States and Canada for sale and use only in countries other than the United States and Canada, materials covered by any of the inventions and discoveries and patent applications and patents included or to be included in the license agreement." (Emphasis supplied.)

The right retained by licensor in the emphasized portion of the quotation is precisely that retained in practice by taxpayer herein, although such right was formally granted licensee herein by the express terms of the 1952 contract. American Chemical Paint Co., supra, found a "license" and not a "sale" of the patent under such a reservation in the licensor. Merck & Co. v. Smith, D.C.E.D.Pa.1957, 155 F.Supp. 843, 845, (footnote 1) affirmed 3 Cir., 1958, 261 F.2d 162 does not weaken the authority of American Chemical Paint Co., supra, but merely serves to emphasize the fact that the reservation was specified in the agreement, and not left to later acts of the parties, as in the case at bar.

ally retained, and it sees that he retained "substantial rights."[7]

On this point, looking to subsequent acts of the parties to arrive at what rights were in actuality transferred and what retained, taxpayer relies very heavily on Wing v. C. I. R., 8 Cir., 1960, 278 F.2d 656. Taxpayer quoted the following from that opinion at page 661:

"It seems to be the contention of the Commissioner that subsequent acts of the parties in granting limited license agreements to various parties had the effect of transforming the assignment from Wing to Parker into a license. By no subsequent act was there reinvested in Wing any substantial right in the patents and Wing's joining with Parker in these sublicenses, whether required by the sublicensee or by Parker, was not inconsistent with his contract assigning all substantial rights in his patents to Parker. The payment of royalties, as pointed out in Watson v. United States, supra, was a part of the compensation received by Wing for assigning all his substantial rights in the patents to Parker."

A complete reading and understanding of the quoted passage and the whole case will demonstrate that taxpayer's reliance is misplaced. The gist of the passage is that in Wing the subsequent acts *did not* transform a sale by contract into a license; neither the passage quoted nor the case said that subsequent acts *could not* transform a sale into a license. In fact the case and passage seem to demonstrate very clearly just what taxpayer says is not true, and that is, that I may look to subsequent acts of the parties to ascertain just what rights were actually retained. Further as to Wing the court states in the passage quoted that licensor's joining with licensee in

the sublicenses "was not inconsistent with his contract". The acts of Kirby, manufacturing the tools in the United States and selling them abroad, were, it seems to me, inconsistent with his contract.

Taxpayer says that Congress has indicated that the substance of each transaction should be looked to rather than the form in arriving at whether all substantial rights have been transferred. S.Rep.No. 1622, 83d Cong., 2d Sess. 439–440 (1954). I agree. Taxpayer then says that the court cannot look to the foreign sales in arriving at whether all substantial rights were transferred. I do not agree. Taxpayer says that this legislation is to be liberally construed and cites cases which say just that.[8] However liberally construed, this statute says that the patentee must transfer all substantial rights to be eligible for capital gain treatment. What is substantial is often a question of fact as here. Lawrence v. United States, supra. It would seem that had Congress meant for all transfer of interests in patents to receive capital gain treatment, they would have said so. So, the court is still faced with deciding in each case whether all substantial rights were transferred. The right which gives us trouble here is the right of licensor to manufacture the patented device in the United States, or have it manufactured, and sell it abroad; a right he most certainly exercised whether he retained it on the face of the contract or not. (Deft. Exs. 1, 2, 3; Tr. 38–39, 41). As the figures in footnote one demonstrate, taxpayer's net profit from foreign sales in the period from 1955–1958 was $121,372.41. How such monetary gain can be labeled other than "substantial" is beyond the court's understanding. Taxpayer's manufacturing and selling abroad was by the standard of pecuniary

---

7. A somewhat similar examination of subsequent events was made in Reid v. Commissioner, 1956, 26 T.C. 622, 634.

8. Illustrative of the cases liberally construing these sections are (a) Bannister v. United States, 5 Cir., 1958, 262 F.2d 175, 178; (b) Young v. Commissioner, 2 Cir., 1959, 269 F.2d 89, 93; and (c) Wing v. Commissioner, 8 Cir., 1960, 278 F.2d 656, 661. However, none of the cases cited on liberal construction forbids the result reached herein.

return plainly a "substantial right". I so find it to be substantial within the meaning of Internal Revenue Code of 1939, Sec. 117(q), and Internal Revenue Code of 1954, Sec. 1235. Although not precisely in point factually, yet the rationale of American Chemical Paint Co. v. Smith, D.C.E.D.Pa.1955, 131 F.Supp. 734, supports this result. It is believed that an examination of the entire transaction, irrespective of verbal touchstones in the May 1952 contract, compels this conclusion; such a realistic test, buttressed on acts, is called for by S.Rep.No. 1622, 83d Cong., 2d Sess. 439–440 (1954). Had taxpayer Kirby, like Lawrence, in fact divested himself of the right to manufacture for sale abroad, the two cases would be almost identical on their facts. But Kirby manufactured, or had manufactured, in the United States these devices, and he sold them in foreign countries. (Deft. Exs. 1, 2, 3; Tr. 38–39, 41). Therein the facts of the cases are different and reach a different result.

It follows that plaintiffs are not entitled to recover. Judgment will be entered for defendant with costs. The clerk will notify counsel to draft and submit judgment accordingly.